[No. 52342-8. En Banc. June 22, 1989.]

Don Herron, et al, *Appellants,* v. King Broadcasting Company, et al, *Respondents.*

*Rovai, McGoffin, Turner, Larkin & Miller,* by *John A. Miller,* for appellants.

*Riddell, Williams, Bullitt & Walkinshaw,* by *Stephen E. DeForest,* for respondents.

DORE, J.—This defamation case is before us on rehearing of this court's decision in *Herron v. King Broadcasting Co.*, 109 Wn.2d 514, 746 P.2d 295 (1987). The court reversed the trial court's grant of summary judgment in favor of defendants Don McGaffin and KING Broadcasting Co. on the issue of malice. We reaffirm our prior holding. A fair appraisal of the evidence submitted on summary judgment and of the plaintiff's arguments from that evidence clearly show that the defendants were not entitled to summary judgment. The present opinion will clarify the grounds of our decision.

## FACTS

On December 1, 1978, Don McGaffin, a reporter for KING, wrote and delivered the following report which was broadcast on KING's 5:30 p.m. newscast:

> The Prosecutor's office in Pierce County has . . . it has been confirmed that the FBI is being investigated by the Prosecutor's Office in Pierce County [*sic*]. The FBI agents are questioning the Chief Prosecutor, Don Herron, and his deputies about bail bond procedures. Bondsmen John Carbone and Ron Williams are two of the eight men arrested and charged by the Justice Department on racketeering charges this week. Carbone heavily contributed to Herron's election campaign four years ago and again in 1978. Also arrested for racketeering was Herron's close friend and vacation companion, Lamont Zemek. Zemek's ex–wife, Nina Zemak [*sic*], is Herron's long–time administrative aide. The FBI wants to know how Herron and the Pierce County Prosecutor's Office collected forfeited bail bonds, particularly from bondsmen Carbone and Williams. That was confirmed for KING–5 News today when Deputy Prosecutor Terry Sebring told me that he could not discuss bail bond matters. He said it would be inappropriate because his department is being questioned by the FBI and other Justice Department officials. This is the way . . . this is what the FBI is looking at. Let's say you get arrested and charged with a felony down in Pierce County. Sources inside the Sheriff's Department told KING–5 News today the jail officials will urge you to call Carbone's bail bonding company. Say bail is set at $10,000. You don't have the

$10,000. The bondsman, Carbone, for instance, will put up a bond . . . a piece of paper . . . for $10,000. You pay Carbone approximately $1,000 in fees. But if you skip town, then what happens? At that point the prosecutor is supposed to file a motion in court demanding that your $10,000 bond be forfeited to the county. The judge signs the order. The prosecutor is then supposed to serve notice on the bail bondsmen to produce the $10,000 which then goes into the Pierce County Treasurer's Office. That is what is supposed to happen, but if a prosecutor doesn't push the bail bondsman for forfeiture and he doesn't pay up, what happens? Do the judges know? Or check? No. The Clerk of the Court has no way of knowing. Records are organized in such a way that they can't know. Only the prosecutor knows. A deputy . . . or . . . plus a deputy or two. KING–5 News has learned that only 18 times since 1975 has bail been collected on forfeiture in all of Pierce County Superior Court and only 4 of those cases were handled by the Carbone bail bonding company. Once in '75 . . . three times in 1977. Bail bondsmen were irritated at the former Pierce County Prosecutor, Ron Hendry, for pushing to collect those forfeited bail bonds monies. *They contributed approximately half of all campaign money collected by Don Herron, who then beat Ron Hendry in 1974.*

(Italics ours.) Herron's claim rests principally on the highlighted statement, which McGaffin conceded to be false in an affidavit submitted in support of summary judgment. Clerk's Papers, at 186.

McGaffin's investigation, on which he based his report, began with an anonymous telephone call informing him that the FBI was investigating possible improper bail bond procedures by the Pierce County Prosecutor's Office. McGaffin tried and failed to contact Prosecuting Attorney Herron. McGaffin did obtain an interview with Terry Sebring, a deputy prosecutor, who confirmed the existence of the investigation but refused to discuss the matter further. Sebring swore in his affidavit that McGaffin's response to this refusal was hostile. According to Sebring:

He then said with his face close to mine and lowered his voice, "You will regret doing this (indicating refusing to

answer his questions). I will get you (could have been 'fix you'). Just watch the news."

Clerk's Papers, at 262–63. This episode was corroborated by reporter Barbara Anderson and receptionist Maria Chantrey, who were present at the scene.

McGaffin spoke with the Pierce County Superior Court Clerk who supplied him with the statistics used in his report, and a superior court judge, who discussed bail bond forfeitures.

McGaffin also looked at the records of Herron's campaign contributions as reported by the Public Disclosure Commission. The reports list the names of contributors and the amount given by each. The reports for Herron's 1974 campaign show that Herron's contributions totaled approximately $38,000. Only $825 was contributed by bail bondsmen.

McGaffin also interviewed former Pierce County Prosecuting Attorney Ron Hendry and one of Hendry's former deputies, Douglas McBroom. McGaffin could not recall whether he interviewed the two men before or after examining the records of the Public Disclosure Commission. McGaffin asserts that one of the two former prosecutors told him that approximately half of Herron's 1974 contributions came from bail bondsmen. Neither Hendry nor McBroom believes he made such a statement.

Hendry cannot recall whether he and McGaffin discussed bail bonds or bail bondsmen's contributions to Herron at all. He testified, however, that he was certain he did not tell McGaffin that approximately half Herron's contributions came from bail bondsmen.

Q. Would you have told Mr. McGaffin that over half the money collected by Mr. Herron in his campaign to defeat you was supplied by the bail bond interests of Pierce County?
A. No.
Q. Would you have said approximately under one–half?
A. No.
Q. Okay, why wouldn't you have used those words?

A. My recollection from the campaign is that the bail bond contributions to Mr. Herron's campaign were in the neighborhood of $1,500.

Q. If Mr. McGaffin would have asked you how much you thought the bail bond interests would have contributed to Mr. Herron's campaign, what would you have told him? $1,500?

A. Yes.

Deposition of R. Hendry, at 21.

Hendry's deputy McBroom also does not remember the substance of his conversation with McGaffin. McBroom did testify however that he did not tell McGaffin that one–half of Herron's contributions came from bail bondsmen. McBroom testified: "I don't think that I probably, I'm sure I didn't know." Deposition of D. McBroom, at 21.

Herron sued KING and McGaffin for defamation. The trial court granted summary judgment to KING and McGaffin on the ground that no jury question was presented on the issue of material falsity. Clerk's Papers, at 5. This court reversed, holding that Herron had made a sufficient prima facie showing of material falsity to preclude summary judgment and that a jury question also was presented as to actual malice. KING and McGaffin moved for reconsideration and the court granted the motion.[1]

## STANDARDS GOVERNING REVIEW

■ In reviewing a denial or grant of summary judgment, this court applies the same standard as a trial court: construing the evidence in the light most favorable to the non-moving party, the court asks whether a reasonable jury

---

[1]Herron also sued the Bremerton Sun. The Sun was dismissed at an earlier stage of this litigation. Herron attempted to amend his complaint to add United Press International as a defendant after the statute of limitations had run. That motion was denied as untimely, a decision never appealed. Herron also attempted to amend his complaint to include claims based on an 11 p.m. broadcast by KING. That motion was denied, and this court affirmed that decision on the ground that the 11 p.m. broadcast was a separate publication and that therefore the claims based on it could not relate back. *Herron,* at 521. The court's decision on relation back of the amendment was not challenged in the motion for reconsideration and is not an issue here.

could find in favor of that party. If the answer is yes, the motion for summary judgment should be denied and the question should go to the jury. *Wendle v. Farrow,* 102 Wn.2d 380, 383, 686 P.2d 480 (1984).

The plaintiff alleging defamation must show four elements: falsity, an unprivileged communication, fault and damage. *Mark v. Seattle Times,* 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124 (1982). If the plaintiff is a public figure and the defamation concerns his public duties, the plaintiff must show that the defendant acted with malice. *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). All the elements of defamation must be shown with convincing clarity. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 43, 515 P.2d 154 (1973).

█ The plaintiff responding to a motion for summary judgment in a defamation case must show that the jury could decide in his favor while applying the clear and convincing evidence standard. *Anderson v. Liberty Lobby, Inc., supra.* The Court has expressly cautioned, however, that the clear and convincing evidence standard involved in defamation cases does not materially alter the normal standard for deciding motions for summary judgment. While the issue turns on what the jury could find, and while the court must keep in mind that the jury must base its decision on clear and convincing evidence, the evidence is still construed in the light most favorable to the nonmoving party and the motion is denied if the jury could find in favor of the nonmoving party.

> Our holding that the clear–and–convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.

The evidence of the non–movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

(Citation omitted.) *Anderson,* 477 U.S. at 255.

Applying these standards, we have determined that the defendants were not entitled to summary judgment.

## THE FALSE STATEMENTS ALTERED THE STING
### OF THE STORY

The defendants have conceded that the following statement is false: "They [bail bondsmen] contributed approximately half of all campaign money collected by Don Herron, who then beat Ron Hendry in 1974." Clerk's Papers, at 188; Clerk's Papers, at 186. This false statement altered the "sting" of the story, and it is actionable regardless of the other, true statements made in the story.

 The trial court granted summary judgment to KING on the ground that the "sting" of McGaffin's report was true. The "sting" of a report is defined as the gist or substance of a report when considered as a whole. Where a report contains a mixture of true and false statements, a false statement (or statements) affects the "sting" of a report only when "significantly greater opprobrium" results from the report containing the falsehood than would result from the report without the falsehood. *See Mark,* at 496. In terms of the elements of defamation, *Mark* requires the plaintiff to show that the falsehood affects the "sting" of a report as part of his showing of damage. *Mark,* at 494–97.[2]

Judge Schumacher concluded that the "sting" of McGaffin's report was not affected by the statement that

---

[2]This court's earlier opinion discussed the issue of the story's "sting" in terms of "material falsity" because the trial court used that term. Since "material falsity" is not a recognized element of defamation and since *Mark* discusses "sting" in terms of the showing of damage, which is an element, this opinion employs *Mark*'s analytical framework.

"approximately half" of Herron's campaign contributions came from bail bondsmen.

> The gist or the "sting" of the broadcast was that a prosecuting attorney was being investigated in respect to practices concerning bail bonds, that he had a close friend who was arrested with two local bondsmen, and that he had accepted substantial sums from a bondsman to finance election campaigns, all of which is conceded to be true. Whether bondsmen contributed "approximately half" of plaintiff's campaign money and whether one of them contributed "again in 1978" does not appear to make any appreciable difference in the impact of the broadcast.

(Italics omitted.) Clerk's Papers, at 5. This court reversed the trial court on this issue because it concluded that the statement that one–half of Herron's contributions came from bail bondsmen added a distinct and separate implication that Herron had "bargained away his ethics and integrity in exchange for campaign contributions." That added implication affected the "sting" of the report. *Herron,* at 523.

In their motion for reconsideration, KING and McGaffin argue that this court misconstrued *Mark*'s requirement that the allegedly defaming statement should be considered as a whole. KING lists these true statements made in the broadcast:

a. The Pierce County Prosecutor's office was under investigation by the FBI;

b. The FBI agents were questioning the Chief Prosecutor, Don Herron, and his deputies about bail bond procedures;

c. Earlier that week, eight men were arrested and charged by the Justice Department on racketeering charges, and two of those arrested were bail bondsmen;

d. One of the arrested bondsmen, John Carbone, had contributed to Herron's election campaigns in 1974 and 1978;

e. One of the other arrested men, Lamont Zemek, was a close friend and vacation companion of Herron, and

Zemek's ex–wife, Nina Zemek, was a longtime administrative aide for Herron; and

f. Bail bondsmen were irritated at the former Pierce County Prosecutor, Ron Hendry, for pushing to collect forfeited bail bond moneys.

KING argues that these true statements are so damaging to the plaintiff that the additional untrue statement does not change the sting of the story, even though it might constitute an additional negative innuendo.

KING and the trial court both make the same fundamental error. Both interpret *Mark*'s instruction to consider the defaming statement "as a whole" to mean this: In a true, negative story the addition of a further, false negative statement does not change the "sting" of the story because the story would be damaging in any case without the false statement. They conclude that the true statements contained in KING TV's report were so damaging to Herron that the additional untrue statement could not do further damage. This is not a correct reading of *Mark*.

First, the argument rests on the patently flawed premise that reporting true information harmful to a plaintiff's reputation is somehow a license to report a damaging falsehood in addition. It should be self–evident that Mark does not rest on any such premise.

Second, as noted, the "sting" inquiry introduced by *Mark* is part of the plaintiff's required showing of damage. The question is whether the false statement has resulted in damage which is distinct from that caused by true negative statements also contained in the same report. If it has not, then whatever damage the plaintiff has suffered does not amount to defamation because it is not solely attributable to the falsehood. In that case, the plaintiff has not made a prima facie case. If, however, the plaintiff can show that the damage resulting from the falsehood is a distinct result of the falsehood, then he has established that element of his prima facie case. *Mark* requires a court to consider the defamatory report as a whole because it is necessary to

determine whether or not the damage caused by the false-hood is distinct from the damage caused by the true statements in the report.

If we analyze this case under the true logic of *Mark,* it is absolutely clear that the false statement contained in KING TV's report did alter the "sting" of the story. The statement that one–half of Herron's contributions came from bail bondsmen added a distinct and separate implication that Herron had bargained away his ethics and integrity in exchange for campaign contributions. None of the true statements in the KING TV report mitigated this falsehood. Furthermore, the damage inflicted by this falsehood was entirely distinct from that inflicted by the true statements contained in the report.

This can be explained by distinguishing this case from *Mark. Mark* arose out of the prosecution of a Medicaid fraud scheme. The prosecution was based in part on an audit that had indicated over $200,000 in fraudulent billings. The defendant (later the plaintiff in the defamation suit) Albert M. Mark was charged with grand larceny in an amount greater than $75 and was eventually convicted at trial of submitting invalid Medicaid claims totaling about $2,500. Seattle television station KOMO incorrectly reported that the fraud scheme involved $300,000 and $350,000 in false claims. Another station, KIRO, incorrectly reported that Mark was "charged" with defrauding the State of $200,000.

This court held that those false reports did not damage Mark and that he therefore could not establish a prima facie case of defamation. The court reasoned that the "sting" of the story was the report of the crime and that the defendants' inflating the amount involved did not alter that "sting".

> [W]e think it apparent that the gist of the KIRO–TV and KOMO–TV reports was the arrest for Medicaid fraud involving large amounts of funds. No significantly greater opprobrium attaches to a statement that a person "bilked the state out of at least $300,000" . . . than to

> one that he was charged with larceny based on an audit sample revealing "over $200,000 in fraud billing". . . . The inaccuracy, if any, does not alter the "sting" of the publication as a whole and does not have a materially different effect on a viewer, listener, or reader than that which the literal truth would produce.

*Mark,* at 496. In other words, it was the theft, not the amount of the theft, that constituted the story's sting. The damage to Mark came from being called a thief. Being called a major thief rather than a petty thief did not add a separate and distinct type of damage to the story. A thief is a thief. Therefore, the inflation of the amounts involved did not affect the "sting" of the story in *Mark.*

In concluding that the falsehood contained in McGaffin's story did not affect its "sting", Judge Schumacher drew a direct analogy to *Mark* and the other theft cases cited therein. He reasoned that, just as it was the theft and not the amount of the theft that formed the sting of the story in Mark, it was the bail bondsmen's contributing to Herron's campaign, not the amount of the contributions, that formed the sting of McGaffin's story.

That analogy is false. *Mark* is correct in concluding that the sting of the TV reports was in the report of the theft, not the amount. Any theft, no matter how large or small, is a culpable act. This case, however, involves political contributions, not theft. It is *not* the case that any contribution to a political campaign, no matter how large or small, is culpable. A large contribution may be a sign of corruption; a small contribution is not.

In the modern world of politics, campaign contributions are contributed by the rich and poor, the famous and infamous without inference of wrongdoing. A supporter of Prosecutor Herron who saw on KING TV that he had received $825[3] in contributions to his campaign from bail

---

[3] Herron received $300 from Carbone Bail Bond Co. and $525 from Baker–Johnson Agency. Brief of Appellant app. A. Exhibit 1A (letter from Don Herron to KING (Feb. 5, 1979)).

bondsmen would say "so what" and continue to support him. There is little or no sting to such a statement.

On the other hand, if that supporter heard that the prosecutor, who in many ways affects the incomes of both bail bondsmen and Pierce County by forfeiting or not forfeiting bail bonds, was receiving 50 percent of his campaign funds from the bail bondsmen, he would assume that Herron was dishonest and in the pocket of bail bondsmen.[4] He would never again vote for such a public official, especially a prosecutor, who has so much discretion in administering justice and setting moral standards in the county; "50 percent of all his campaign contributions" is the *sting*. There is no sting to a group of businessmen such as bail bondsmen contributing $825 to Herron's campaign. The $825 constituted only 2 percent of all of Herron's contributions, not 50 percent. The latter statement, but not the former, implied that Herron had taken a bribe.

Because it had a distinct and separate damaging implication, the false statement in the KING TV report altered the "sting" of the story; it had a distinct and damaging implication not otherwise conveyed by the report. In terms of the elements of defamation, Herron did offer evidence from which a jury could conclude that he was damaged by the falsehood in McGaffin's report in a way that was distinct from any damage inflicted by the true statements in the report. The inflated figure, and that alone, suggested that Herron had sold his integrity as a public official. Therefore, the trial court erred in granting summary judgment on the ground that the "sting" of McGaffin's report was not affected by the false statement.

### HERRON MADE OUT A PRIMA FACIE CASE OF MALICE

█ It is undisputed that Herron was a public figure. In order to maintain a defamation action, therefore, he must

---

[4]The public disclosure records show that the "Committee to Elect Don Herron" collected a total of $38,801 in cash and in kind for the 1974 campaign. Half of this sum is $19,400.50.

be able to prove that McGaffin and KING acted with malice, and not merely negligently. Herron presented evidence from which a jury could conclude that McGaffin published a false statement with malice, specifically with reckless disregard for the statement's truth or falsity. The trial court erred in granting summary judgment.

Malice is defined as publishing a falsehood with actual knowledge of its falsity or with reckless disregard for its truth or falsity. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). There was no evidence offered to show that McGaffin had actual, subjective knowledge that the one–half figure was false. The question is whether there was evidence from which a jury could conclude that McGaffin acted with reckless disregard. The Supreme Court of the United States defined that term in *St. Amant v. Thompson,* 390 U.S. 727, 730–31, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968).

> "Reckless disregard," it is true, cannot be fully encompassed in one infallible definition. . . . In *Garrison v. Louisiana,* [379 U.S. 64, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964)] . . . the opinion emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of . . . probable falsity." Mr. Justice Harlan's opinion in *Curtis Publishing Co. v. Butts,* [388 U.S. 130, 153, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967)], stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.*

(Citations omitted. Italics ours.) In order to avoid summary judgment, the plaintiff must offer evidence from which a

jury could conclude, under the clear and convincing standard, that the defendant acted with reckless disregard. *Anderson v. Liberty Lobby, Inc., supra.*

Herron's evidence consists primarily of two facts. First, McGaffin claims that he was given the figure of one–half by the former prosecutor Hendry or his deputy McBroom. However, both Hendry and McBroom stated not only that they did not remember giving him that figure, but that they themselves never had such a belief, and therefore would not have said such a thing.

Hendry could not recall whether he and McGaffin discussed bail bonds or bail bondsmen's contributions to Herron at all. He testified, however, that he was certain he did not tell McGaffin that approximately half Herron's contributions came from bail bondsmen. Deposition of Ronald Hendry, at 21.

Hendry's deputy McBroom also could not remember the substance of his conversation with McGaffin. McBroom did testify however that he did not tell McGaffin that one–half of Herron's contributions came from bail bondsmen. Deposition of Douglas McBroom, at 21.

Construing this evidence in the light most favorable to Herron, the court must assume that McGaffin did not get the figure of one–half from either Hendry or McBroom.

Second, McGaffin admits that he did look at the records of the Public Disclosure Commission and that he identified those contributors who were bail bondsmen. Deposition of Don McGaffin, at 41. The bail bondsmen identified by McGaffin contributed only $825 to Herron's campaign, which McGaffin admitted he could have ascertained by simply adding up the figures. This was far less than one–half of Herron's total contributions; in fact it was only slightly more than 2 percent.

These two pieces of evidence are sufficient to create an issue of fact as to whether McGaffin "entertained serious doubts as to the truth of his publication." *St. Amant,* at 731. Construing the evidence in the light most favorable to Herron, McGaffin had no basis in fact for reporting the

one–half figure. Furthermore, his investigation actually uncovered facts which directly rebutted his false statement.

██ Failure to investigate is not sufficient to prove recklessness. *Sullivan,* at 287; *St. Amant,* at 733. Nor do mistakes made in the course of investigating a news story necessarily constitute recklessness. *Time, Inc. v. Pape,* 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633 (1971). However, when a reporter does in fact conduct an investigation and his investigation does not support his false statement or brings to his attention facts which rebut the false statement, that is evidence from which a jury can infer reckless disregard.

A case directly on point is *Kuhn v. Tribune–Republican Pub'g Co.,* 637 P.2d 315 (Colo. 1981). In *Kuhn,* the defendant newspaper had published a story that officials of the Greeley (Colorado) Department of Parks and Recreation had accepted season ski lift passes from the owners of two ski areas. Those two ski areas were later chosen by the officials for lucrative group ski lift ticket purchases by the department. The article implied that the department officials had chosen the ski areas because they personally had received free passes.

The reporter who wrote the story, John Seelmeyer, conducted an investigation which rebutted several of the false statements made in the article. For example, the season passes were given to the department, not to the officials personally, as reported. The story also contained information which simply had no basis in fact; for example, a dollar value for the business directed by the department to one of the ski areas.

The Supreme Court of Colorado reversed a Court of Appeals decision that summary judgment should have been granted for the defendant.

> Here, a jury could reasonably find that the publication failed even to meet [the] generous standard [of *Sullivan* and *St. Amant*]. Seelmeyer admitted that he had no bases for most of his erroneous statements, and that he failed to take the time to corroborate allegations made in

the article, even though no particular urgency existed as to the time of publication. Actual malice may be inferred by the finder of fact if an investigation is grossly inadequate. In this context, a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth.

(Citations omitted.) *Kuhn,* at 319. *See also Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024 (5th Cir. 1975).

In another case on point, *Green v. Northern Pub'g Co.,* 655 P.2d 736, 38 A.L.R.4th 817 (Alaska 1982), *cert. denied,* 463 U.S. 1208 (1983), the defendant published a story which suggested that a prisoner, David Selberg, had died as a result of treatment in jail and that the plaintiff, a Dr. Green, was in part responsible for Selberg's death. In fact, an autopsy reported that Selberg had died of natural causes unrelated to his incarceration. Green offered evidence that the defendant's reporters were aware of the exonerating autopsy report. The Supreme Court of Alaska reversed the trial court's grant of summary judgment, holding that the reporters' knowledge of the autopsy report created an issue of material fact on reckless disregard.

McGaffin's report suffers from the same defects as those at issue in *Kuhn* and *Green.* Taking the evidence in the light most favorable to Herron, McGaffin's investigation provided no basis for his false statement and in fact revealed contrary evidence. This is more than a mere failure to investigate and more than a mere mistake. Since the jury could conclude that McGaffin acted with reckless disregard, Herron is entitled to a trial on the issue of malice.

 In addition to the evidence which directly supports an inference of reckless disregard, the jury would also be entitled to consider McGaffin's threat addressed to Sebring.[5] "Malice" for defamation purposes is entirely

---

[5]The dissent's contention that this evidence was "the mainstay" of Herron's case completely misrepresents his argument. As we have explained, the "mainstay" of Herron's prima facie showing of malice is the fact that neither Hendry nor McBroom gave McGaffin the one–half figure and the fact that McGaffin admitted looking at records which, McGaffin admitted, indicated to him that only

distinct from simple hostility. *McDonald v. Murray,* 83 Wn.2d 17, 19, 515 P.2d 151 (1973). Nevertheless, it is well established that evidence of malice in the colloquial sense is at least relevant to malice in the legal sense. *Reader's Digest Ass'n v. Superior Court,* 37 Cal. 3d 244, 258, 690 P.2d 610, 208 Cal. Rptr. 137, 145 (1984). This evidence bolsters the inference that McGaffin might have been reckless regarding the truth of his statements, and supports the conclusion that Herron succeeded in offering sufficient evidence of malice to go to the jury.

## CONCLUSION

Herron presented sufficient evidence of damage and malice to reach the jury. The false statement that one–half of Herron's campaign contributions came from bail bondsmen was damaging in a way distinct from whatever harm might have resulted from McGaffin's true statements. The "sting" of McGaffin's story was greatly affected by the falsehood. To say that bail bondsmen had contributed $825 to Herron's campaign would hardly raise an eyebrow, but to say that bail bondsmen contributed 50 percent of all his contributions would mean to members of the public that their prosecutor was on the take and that bail bondsmen have him on their payroll. Herron offered sufficient evidence from which a jury might conclude that McGaffin acted with reckless disregard. Taken in the light most favorable to Herron, the evidence showed that McGaffin's false statement was not supported by his investigation and in fact contradicted its results. This, together with McGaffin's expressions of hostility, would support a jury verdict of actual malice, specifically reckless disregard of the truth and/or falsity of his statement.

---

$825 was contributed by bail bondsmen. The dissent wholly fails to account for Herron's real argument or the facts which support it sufficiently to entitle him to go to the jury.

We therefore reverse the trial court's grant of summary judgment and remand for trial.

CALLOW, C.J., and BRACHTENBACH, DOLLIVER, and SMITH, JJ., concur.

ANDERSEN, J. (dissenting)—Because Don McGaffin, formerly of KING–TV, is a tough and sometimes caustic news commentator, who made a mistake of fact in the newscast involved in this case, it is perhaps easy to lose sight of what this case is *really* all about. What the majority opinion does is simple. It makes it much easier for public officials to now sue their critics, be they news media, political opponents or simply citizens unhappy with the way that a public office is being conducted. This result is achieved, however, at the expense of First Amendment rights and values, namely the promotion of open and vigorous debate on public issues. Moreover, the opinion is not an unmitigated blessing for public officials, since it will now be easier for their political opponents to sue them.

The majority's first opinion in this case was wrong as I pointed out at some length in my dissent.[6] The majority belatedly recognized this by granting a rehearing. Now, in filing a new majority opinion which attempts to change the focus of that opinion, it is still wrong. The trial court's dismissal of the defamation action should be affirmed.

I first address the majority's new analysis of the "sting" of the broadcast in question. Contrary to the majority's present assertion, falsity is an essential element of defamation.[7] Truth is a defense to a charge of falsity in a defa-

---

[6]*Herron v. KING Broadcasting Co.,* 109 Wn.2d 514, 529, 746 P.2d 295 (1987) (Andersen, J., dissenting).

[7]*Margoles v. Hubbart,* 111 Wn.2d 195, 198, 760 P.2d 324 (1988); *Mark v. Seattle Times,* 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124 (1982).

mation action.[8] In asserting this defense, a defamation case defendant need not prove the *literal* truth of every claimed defamatory statement.[9] A defendant in a defamation action may obtain summary judgment by showing that the statement is *substantially* true or that the gist of a story, the portion that carries the "sting", is true.[10] The sting of a story is altered only when *significantly greater opprobrium* attaches to the report containing the false statement than it would to the report without that statement.[11]

The majority is correct in stating that the "sting" of a report is defined as the gist of a report when considered *as a whole*. Thus, defendant Don McGaffin's[12] entire newscast must be evaluated in analyzing its sting; single sentences should not be considered separately and out of context.[13] In a case such as this one, where there is an undisputed inaccuracy, the court is well qualified to examine the gist of the entire newscast. As one federal court observed,

> where there is no dispute as to the underlying facts, the question of whether a statement is substantially accurate

[8]Restatement (Second) of Torts § 581A (1977); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* 841–42 (5th ed. 1984); *see also Margoles,* at 202.

[9]*Mark,* at 494; *Orr v. Argus–Press Co.,* 586 F.2d 1108, 1112–13 (6th Cir. 1978), *cert. denied,* 440 U.S. 960 (1979).

[10]*Mark,* at 494; *Orr,* at 1112–13; *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1296 (D.C. Cir.), *cert. denied,* 109 S. Ct. 75 (1988).

[11]*See Mark,* at 496; W. Keeton, at 842.

[12]The other defendant in this case is KING Broadcasting Company, d/b/a KING–TV Channel 5. For convenience, I will refer to Mr. McGaffin as the sole defendant.

[13]*See* W. Keeton, at 782; *Lavin v. New York News, Inc.,* 757 F.2d 1416 (3d Cir. 1985); *Reeves v. American Broadcasting Cos.,* 580 F. Supp. 84 (S.D.N.Y), *aff'd,* 719 F.2d 602 (2d Cir. 1983).

is one of law for the Court. The Court should not scrutinize simply the literal references of the language in question, but should weigh the words together with their context.

(Citations omitted.) *Williams v. WCAU–TV,* 555 F. Supp. 198, 203 (E.D. Pa. 1983).

In "clarifying" its first opinion, the majority carefully omits any reference to the context of the incorrect "approximately half" statement. While conceding that the broadcast should be analyzed as a whole, the new majority opinion then proceeds to do *just exactly the opposite*; it discusses the single incorrect sentence in a vacuum. According to the polemic essay on campaign contributions contained in the new majority opinion, "[t]here is no sting to a group of businessmen such as bail bondsmen contributing $825 to Herron's campaign. . . . The inflated figure, *and that alone,* suggested that Herron had sold his integrity as a public official." (Italics mine.)[14] Such an analysis conveniently ignores the rest of the truthful statements made in the broadcast, and the light that they cast on Pierce County bail bondsmen and plaintiff Don Herron,[15] who was then Pierce County Prosecuting Attorney. Rightly or wrongly, these *truthful* statements portrayed the bondsmen as less than civic–minded business people and the plaintiff as less than an unimpeachable public servant.

The defendant correctly stated in his broadcast that two bondsmen had been arrested on racketeering charges by the Justice Department, that one of them contributed heavily to plaintiff's campaign, that the Federal Bureau of Investigation wanted to know how plaintiff collected forfeited bail bonds, that his office had forfeited bonds and collected bail in only a limited number of cases, and that bail bondsmen had been unhappy with plaintiff's predecessor, whom

---

[14]Majority opinion, at 774.

[15]The plaintiffs herein are Don and Patricia Herron, husband and wife. For convenience, I refer to Mr. Herron as the sole plaintiff.

plaintiff defeated at the last election, for pushing to collect forfeited bail bond moneys.

The trial judge in this case correctly recognized that the gist of these *truthful* statements was less than laudatory:

> The gist or the "sting" of the broadcast was that a prosecuting attorney was being investigated in respect to practices concerning bail bonds, that he had a close friend who was arrested with two local bondsmen, and that he had accepted substantial sums from a bondsman to finance election campaigns, all of which is conceded to be *true*.

Memorandum decision, at 5 (part).

Given the defendant's truthful statement that an arrested bail bondsman contributed substantially to plaintiff's election campaign, I fail to see how the false statement that bondsmen contributed "approximately half" of plaintiff's campaign money attached *significantly* greater opprobrium to the newscast. The applicable legal standards are these: in asserting the defense of truth, a defendant need not prove *literal* truth but *substantial* truth; simply that the *gist* of the story is true. In my view the trial court was absolutely correct when it decided that the gist of the defendant's news report was true.

The majority would now have us believe that the last sentence in the news report, the "approximately half" statement, resulted in distinct damage to the plaintiff. The majority claims that this statement alone implied that plaintiff had "bargained away his ethics and integrity in exchange for campaign contributions."[16] This damage was present regardless of the amount of bail bond contributions reported. In the context of the entire newscast, and under the extraordinary circumstances existing in Pierce County law enforcement at the time in question, *any* bail bondsman's contribution to the prosecuting attorney's campaign would necessarily be suspect to some degree. As plaintiff himself noted in his answer to the defendant's

---

[16]Majority opinion, at 772.

motion for reconsideration, the gist of the defendant's story was the attempt to connect plaintiff to some kind of criminal conspiracy with those who were being arrested and charged at the time.[17] Fairly or unfairly, a reading of the text of the newscast shows that this attempt was successful even without the "approximately half" statement.

This is particularly true in light of the broader context of the newscast, which the majority excises entirely from its new opinion. In determining whether the gist and sting of a story is true, the court is required to view the story through the eyes of the average member of the audience.[18] The KING–TV audience did not live in a vacuum. Some of its audience undoubtedly was aware of the extraordinary events occurring in Pierce County at the time. As even the majority admitted in its initial opinion in this case, "*[t]he background of this case was a racketeering scandal of proportions unprecedented in this state which attracted intensive media attention.*" (Italics mine.)[19] The former majority opinion then went on to describe some of the details of that racketeering scandal:

On November 28, 1978 *the Pierce County Sheriff and seven others were arrested on racketeering charges. In connection with those charges, there was a federal probe into a series of Pierce County arson fires. In addition to those stories, the media reported that a local bail bondsman and one of the persons arrested, Lamont Zemek, had been vacationing earlier that month with a local district court judge and the Prosecuting Attorney of Pierce County, Don Herron.*

(Italics mine.) *Herron v. KING Broadcasting Co.*, 109 Wn.2d 514, 515, 746 P.2d 295 (1987).

---

[17]Answer to Motion for Reconsideration, at 3.

[18]*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1073 (5th Cir. 1987).

[19]*Herron*, at 515.

Along with arson, federal officials investigated alleged acts of attempted murder, bribery, extortion, illegal gambling and prostitution.[20] The investigation of Pierce County's chief legal officer by the FBI and Department of Justice for possible wrongdoing came just 3 days after the arrest on federal racketeering and extortion charges of Pierce County Sheriff George Janovich and two Pierce County bail bondsmen, John J. Carbone and Ron Williams.[21] The Carbone Bail Bond Company was a substantial contributor to plaintiff's election campaign.[22] Moreover, Prosecutor Herron knew that his recent vacation partner, Lamont Zemek, had a criminal record, and that he (the prosecuting attorney) employed Zemek's ex–wife as an administrative aide![23]

Thus, the defendant's newscast was not a simple story about campaign contributions, as the majority would now have us believe. Even if viewers knew nothing of the broader series of events occurring in Pierce County, which hardly seems possible, the truthful statements in the broadcast were enough to give them pause. The majority assumes that a supporter of plaintiff who saw that he had received $825 from bail bondsmen would say "so what" and continue to support him. I beg to differ. That supporter, rightly or wrongly, might not wish to contribute to the political campaign of an official, specifically the county's chief legal officer, who accepted substantial contributions from a bail bondsman arrested by the Justice Department for racketeering, who had vacationed with a close friend also arrested for racketeering, and whose office was undergoing an FBI investigation regarding its bail bond procedures.

---

[20]*Herron,* 109 Wn.2d at 533 (Andersen, J., dissenting.)

[21]*Herron,* 109 Wn.2d at 533 (Andersen, J., dissenting).

[22]*Herron,* 109 Wn.2d at 533 (Andersen, J., dissenting).

[23]*Herron,* 109 Wn.2d at 533 (Andersen, J., dissenting).

When the defendant's broadcast is examined in its entirety, it seems eminently clear that it is the fact of contributions from people in the Pierce County bail bond business—whether minimal, substantial, or approximately half—that stings. The broadcast was a story about possible corruption, and that possibility was present even without the incorrect "approximately half" statement which appeared only in the last sentence of a relatively long newscast. The majority's new and laborious analysis of the sting of the broadcast is both incorrect and unpersuasive. I would affirm the experienced trial court's well–considered decision that the inaccurate statement did not alter the sting of the broadcast as a whole.

I turn next to the majority's conclusion that plaintiff presented clear and convincing evidence of actual malice sufficient to overcome the defendant's motion for summary judgment. In reaching that conclusion, the majority sidesteps the fact that somewhat different summary judgment principles apply in defamation cases brought by public officials against news media defendants. This is because such cases involve the protection of basic First Amendment rights and values.

With the exception of the majority opinion in this case, a heavier burden traditionally has been imposed on plaintiffs in public figure defamation cases. As we observed when we unanimously affirmed the dismissal of this same plaintiff's defamation action against the Tribune Publishing Company, which arose out of these same public events,

When a defamation claim is brought by a public official regarding statements made about the official's performance of his public duties, the plaintiff must prove that the statements were made with actual malice. The burden of proof for the element of actual malice is "clear and convincing evidence", not the less stringent "preponderance of the evidence" burden ordinarily required in civil suits. This heavier burden is imposed at the summary judgment stage as well as at trial; to survive a defendant's summary judgment motion for dismissal, the

plaintiff must offer evidence sufficient to permit a reasonable trier of fact to find clear and convincing proof of actual malice. As with other summary judgment motions, the nonmoving party is entitled to have the evidence viewed in a light most favorable to him and against the moving party. However, if the plaintiff, as nonmoving party, can only offer a "scintilla" of evidence, evidence that is "merely colorable", or evidence that "is not significantly probative", the plaintiff will not defeat the motion. Moreover, conclusory statements in a plaintiff's affidavit are insufficient; the plaintiff must demonstrate the basis for his assertions. The inquiry before this court, then, is whether, in viewing all the evidence in a light most favorable to the Herrons, a reasonable trier of fact could find clear and convincing proof that the defendants published their articles with actual malice.

(Footnote and citations omitted.)[24]

The actual malice standard is subjective in that it focuses on the media defendant's knowledge that his or her statement is false or made with reckless disregard of its falsity.[25] Thus, a public official plaintiff must show that a media defendant "*in fact* entertained serious doubts as to the truth of his publication."[26]

A plaintiff may in the proper case prove the defendant's state of mind through the cumulation of circumstantial as well as direct evidence.[27] We must keep in mind, however, our responsibility in reviewing such evidence.

[A]ctual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of

---

[24]*Herron v. Tribune Pub'g Co.*, 108 Wn.2d 162, 169–70, 736 P.2d 249 (1987); *see also Margoles v. Hubbart*, 111 Wn.2d 195, 199, 760 P.2d 324 (1988). *Accord, Rye v. Seattle Times Co.*, 37 Wn. App. 45, 678 P.2d 1282, *review denied*, 102 Wn.2d 1004, *cert. denied*, 469 U.S. 1087 (1984).

[25]*Margoles*, at 200; *Herron v. Tribune Pub'g Co.*, *supra* at 170.

[26]*Margoles*, at 200, quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968).

[27]*Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir.), *cert. denied*, 108 S. Ct. 200 (1987); *see also Margoles*, at 200; *Liberty Lobby*, at 1293.

circumstantial evidence tending to show that the defendant published in bad faith. Such an approach would be inadequate to ensure correct application of both the actual malice standard and the requirement of clear and convincing evidence. Thus, . . . the Supreme Court has directed us to . . . "make an independent examination of the whole record."

(Citation omitted.) *Tavoulareas v. Piro,* 817 F.2d 762, 789 (D.C. Cir.), *cert. denied,* 108 S. Ct. 200 (1987), quoting *Edwards v. South Carolina,* 372 U.S. 229, 235, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963).

After its examination of the entire record, the majority now concedes that the plaintiff has presented only two "facts" to show the defendant's actual malice. One such "fact" is the Hendry and McBroom denials that they told the defendant that people in the bail bond business contributed approximately half of plaintiff's campaign funds in 1974. It should be noted that these alleged denials were contained in depositions taken 3 years after Hendry and McBroom talked to the defendant. The majority states that "Hendry could not recall whether he and McGaffin discussed bail bonds", yet adds that Hendry was "certain" he did not tell the defendant about amounts of bail bondsmen's contributions.[28] The record reveals that Mr. Hendry was less than certain about the content of his conversation with the defendant. As Ronald Hendry stated, "I honestly don't remember much about the conversation at all other than that he, as well as a number of people, were calling during that period of time."[29] The majority then writes that Douglas McBroom "also could not remember the substance of his conversation with McGaffin", yet he testified that he "did not tell" the defendant that one–half of plaintiff's contributions came from bail bondsmen.[30] Mr.

---

[28]Majority opinion, at 776.

[29]Deposition of Ronald Hendry, at 9.

[30]Majority opinion, at 776.

McBroom's testimony was more equivocal than the majority suggests: "I don't specifically recall telling anyone that and I don't specifically recall not telling anyone that."[31] I fail to perceive how such vague recollections about what might or might not have been said to a reporter 3 years earlier can be categorized as probative evidence of actual malice or deliberate falsification. In no way do these "denials" indicate that the defendant *in fact* exercised serious doubts about the truth of his broadcast, as the majority now implicitly suggests.

The second "fact" the majority uses to establish the presence of actual malice is the defendant's admission that he looked at the records of the Public Disclosure Commission "and that he identified those contributors who were bail bondsmen."[32] This statement is misleading. What the defendant said was "when I checked the PDC forms I quickly found the names of Carbone and Williams and people like that."[33] Thus, while the defendant identified some contributors as bail bondsmen, there is no proof that he knew the occupations of all of the plaintiff's 500 listed contributors or who among them were in the bail bond business. To suggest, as does the majority, that Don McGaffin recognized every bail bondsman whose name appeared in the list is to suggest that he had subjective knowledge that his "approximately half" statement was false. Indeed, that is precisely what the majority's analysis concludes, despite its earlier admission that "[t]here was no evidence offered to show that McGaffin had actual, subjective knowledge that the one–half figure was false."[34] To

[31]Deposition of Douglas McBroom, at 21.

[32]Majority opinion, at 776.

[33]Deposition of Don McGaffin, at 41.

[34]Majority opinion, at 775.

suggest that the defendant's investigation "actually uncovered facts which directly rebutted his false statement",[35] as the new majority opinion does, is to suggest that the defendant knowingly lied. There is simply no evidence in the record to support such an assertion, and the absence of such evidence of conscious fabrication is precisely what distinguishes this case from two cases that the majority cites and refers to as being directly "on point".

The first of those cases is *Kuhn v. Tribune–Republican Pub'g Co.*, 637 P.2d 315 (Colo. 1981). The court's description of the reporter's work in *Kuhn* clearly reveals evidence of conscious fabrication, or reckless disregard for the truth.

> When one fails to contact and question obvious available sources of corroboration, fabricates specific facts appearing in a story, and writes the story in a manner calculated to invite a factual inference that the newspaper has uncovered governmental corruption and bribery, one knowingly risks the likelihood that the statements and inferences are false and thereby forfeits First Amendment protections.

*Kuhn,* at 319. Moreover, the reporter in *Kuhn* spent 2 hours investigating and 30 minutes writing his story even though no particular urgency existed as to the time of publication.[36] Since there is no evidence in the present case that the defendant ignored obvious sources of corroboration, fabricated specific facts, or wrote in a manner calculated to invite an improper inference, it is impossible to justify the majority's claim that *Kuhn* is "directly on point". Moreover, contra to the news story in *Kuhn,* the newscast in this case was a classic hot news story, where a sense of urgency as to time of publication clearly existed. Even though the defendant verified his story more carefully than did the reporter in *Kuhn,* extensive verification was not required. As one federal court explained:

---

[35]Majority opinion, at 777.

[36]*Kuhn v. Tribune–Republican Pub'g Co.*, 637 P.2d 315, 317 (Colo. 1981).

The standard of recklessness may vary with respect to the nature of the publication involved. Where an article is planned months in advance and time is not crucial, more extensive verification procedures may be required. However, in reporting "hot" news items of public interest for rapid dissemination, the courts have recognized that extensive verification procedures are impracticable and, therefore, not required.

(Citation omitted.) *McFarland v. Hearst Corp.,* 332 F. Supp. 746, 749 (D. Md. 1971). Furthermore, it is widely recognized that a mistake is not evidence of serious doubts and that inadequate investigation does not equal actual malice.[37] These statements would seem to be of greater significance in the context of a hot news story such as that involved here.

The majority also sees as "on point" a second case, *Green v. Northern Pub'g Co.,* 655 P.2d 736, 38 A.L.R.4th 817 (Alaska 1982), *cert. denied,* 463 U.S. 1208 (1983), in which it was undisputed that a reporter was aware of evidence that directly contradicted one of her story's major assertions.[38] In *Green,* therefore, there was uncontroverted evidence that a reporter had subjective knowledge of the falsity of her story. In the present case, the majority admits that there is no evidence of subjective knowledge of falsity. Trying to create such evidence through faulty comparisons with two readily distinguishable cases does not mean it is there.

Besides the two "facts" of actual malice the majority presents, its opinion also directs attention to the defendant's alleged threat to one of the plaintiff's deputies, not as evidence of actual malice, but as evidence that "bolsters the inference that McGaffin might have been reckless regarding

---

[37]*See Time, Inc. v. Pape,* 401 U.S. 279, 292, 28 L. Ed. 2d 45, 91 S. Ct. 633, *reh'g denied,* 401 U.S. 1015 (1971); *Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 171, 736 P.2d 249 (1987); *Robertson v. McCloskey,* 666 F. Supp. 241, 250 (D.D.C. 1987); *LaBruzzo v. Associated Press,* 353 F. Supp. 979, 985 (W.D. Mo. 1973).

[38]*Green v. Northern Pub'g Co.,* 655 P.2d 736, 742, 38 A.L.R.4th 817 (Alaska 1982), *cert. denied,* 463 U.S. 1208 (1983).

the truth of his statements".[39] By this point in its opinion, the majority seems to have forgotten the requirement that a public official plaintiff must have *clear and convincing proof of actual malice* to survive a defendant's summary judgment motion for dismissal in a defamation case.[40] Evidence that "bolsters" an "inference" that a defendant "might" have acted with reckless disregard simply does not rise to the level of proof this court has heretofore demanded. Such evidence does no more than pyramid inference upon inference. Moreover, the defendant's alleged threat to the deputy prosecutor—not to plaintiff, and unheard by the three other people in the room—is insufficient to even bolster an inference that the defendant acted with malice in making his broadcast. We recently explained this in *Margoles v. Hubbart,* 111 Wn.2d 195, 760 P.2d 324 (1988). As we observed there, a reporter can "get" somebody by telling the truth as well as by resorting to defamation.[41] In *Margoles,* we cited the discussion of such threats by the District of Columbia Court of Appeals sitting en banc in *Tavoulareas v. Piro,* 817 F.2d 762, 795 (D.C. Cir.), *cert. denied,* 108 S. Ct. 200 (1987):

> These statements, not unknown to the vernacular of litigators, seem to us well within the everyday parlance of an *investigative* reporter. They may reasonably be interpreted as revealing that [the reporter] had adopted an adversarial stance toward [the plaintiff]. But, as in other professions, an adversarial stance is fully consistent with professional, investigative reporting. It would be sadly ironic for judges in our adversarial system to conclude,

---

[39]Majority opinion, at 779.

[40]*Herron,* 108 Wn.2d at 170.

[41]*Margoles v. Hubbart,* 111 Wn.2d 195, 206, 760 P.2d 324 (1988).

. . . that the mere taking of an adversarial stance is antithetical to the truthful presentation of facts. We decline to take such a remarkable step in First Amendment jurisprudence.

In short, as I understand defamation of public officials law, ill will toward the plaintiff or bad motives have never *until now* been elements of actual malice.[42] Evidence of ill will or bad motives should support a finding of actual malice *only* when combined with other, more substantial evidence of a defendant's bad faith.[43]

The two "facts" the majority relies on—Hendry and McBroom denying that they told McGaffin the "approximately half" statement and McGaffin checking the PDC forms before his broadcast—simply do not under settled law constitute the substantial additional showing required to support a finding of actual malice. As the United States Supreme Court instructs, actual malice consists of, for example, evidence establishing that a story was fabricated, so improbable that only a reckless person would have put it in circulation, or based wholly on an unverified anonymous phone call or some other source that the defendant had obvious reasons to doubt.[44] The plaintiff has shown nothing that even remotely resembles such proof. Plaintiff's two "facts" are simply not of significant probative value.

I would hold upon reconsideration that the plaintiff's showing is insufficient as a matter of law to overcome the defendant's motion for summary judgment and that the

---

[42]*See Margoles,* at 207, citing *Tavoulareas,* at 795. *See also Herron v. Tribune Pub'g Co.,* at 170; *Robertson v. McCloskey,* 666 F. Supp. 241, 251 (D.D.C. 1987).

[43]*Margoles,* at 207; *Tavoulareas,* at 795; *Robertson,* at 251.

[44]*St. Amant v. Thompson,* 390 U.S. 727, 732, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968); *see also Tavoulareas v. Piro,* 817 F.2d 762, 790 (D.C. Cir.), *cert. denied,* 108 S. Ct. 200 (1987); *Robertson,* at 252.

trial court was entirely correct when it entered a summary judgment dismissing plaintiff's case.

UTTER, PEARSON, and DURHAM, JJ., concur with ANDERSEN, J.