[No. 20855-9-III. Division Three. November 21, 2002.]

ALPINE INDUSTRIES COMPUTERS, INC., ET AL., *Appellants*, v. COWLES PUBLISHING COMPANY, *Respondent*.

*Richard D. Wall*, for appellants.

*Duane M. Swinton* (of *Witherspoon, Kelley, Davenport & Toole, P.S.*), for respondent.

Brown, C.J. — Alpine Industries Computers, Inc. (Alpine) filed suit against Cowles Publishing Company (Cowles), contending certain statements in a *Spokesman-Review* story were defamatory. The trial court granted summary judgment in favor of Cowles and dismissed Alpine's claim. On appeal, Alpine mainly argues the fair reporting privilege did not protect Cowles. We disagree and conclude Alpine cannot establish the elements of defamation. Accordingly, we affirm.

## FACTS

The *Spokesman-Review* newspaper, a Cowles publication, ran the following story on December 9, 2000:

Microsoft wins $250,000 judgment against Spokane businessman

By Tom Sowa

Staff writer

In the first case of its kind in Spokane, a federal judge Friday imposed a $250,000 judgment against a businessman for selling counterfeit copies of Microsoft software.

*T. James Le, owner of Alpine Computers of Spokane, was ordered to pay that sum for illegal sales of Windows and Office software occurring after December 1998.*

U.S. District Court Judge Alan A. McDonald entered the judgment after a one-day civil trial in Spokane last week.

Microsoft contended that Le had sold about 500 bogus copies of its software.

*Le admitted selling counterfeit software, but insisted it was fewer than 500 copies. The trial only determined the amount of his liability.*

*The key issue was what happened after December 1998, when undercover buyers bought counterfeit copies of Office 97 and*

*Windows 95 software from an Alpine store. Microsoft quickly sent Le a letter warning him to stop the sales.*

*The sales didn't end, however, as Le continued buying software from a supplier in Florida, according to John Nelson, the Spokane attorney representing Microsoft.*

Under federal law, McDonald could have awarded damages amounting to several million dollars against Le.

McDonald instead ruled that a $250,000 award compensated Microsoft and effectively punished Le, who is 28. McDonald also awarded $69,021 in lawyers' fees for Microsoft.

Le has the option of appealing the judgment.

"We think this sends a message that distribution of counterfeit software won't be treated lightly in this district," said Nelson, a member of the Preston, Gates and Ellis firm, which deals with piracy cases across the county for Microsoft.

This is the piracy case in Eastern Washington in which Microsoft targeted a flagrant violator, Nelson said.

The case came to Microsoft's attention when other area software sellers noticed Alpine's low product prices. For instance, Alpine sold Office 97 for $99, rather than the $200 most vendors charged.

Le said during the trial he stopped selling

[Page Break and Sub Headline]

*Microsoft: Le admitted he sold counterfeits*

the Office 97 software after receiving a warning from Microsoft. But he continued selling copies of Windows 95 purchased from the same provider, a Florida company called The Yes Man.

*Before the trial, Le signed an order acknowledging he had wrongly sold counterfeit software.* But he insisted on going to trial to challenge Microsoft's claim that his actions were "willing disregard" for the law.

Le argued in the trial he stopped selling Office 97, but kept selling Windows 95 since the warning letter didn't mention that product by name.

McDonald didn't agree and declared that "Le's decision to continue buying Windows 95 from The Yes Man is consistent with what can only be characterized as an attitude of reckless, if not deliberate, disregard for the intellectual property rights of the plaintiff."

Le could not be reached for comment.

Clerk's Papers (CP) at 188 (emphasis added).

Alpine filed a defamation complaint against Cowles, contending the highlighted portions of the story were defamatory. Cowles moved for summary judgment.

The affidavit of Tom Sowa supported Cowles's summary judgment motion. Mr. Sowa stated that the primary source for his story was the district court file on the Alpine case, including the memorandum opinion. Attachments to Mr. Sowa's affidavit included Microsoft's complaint against Alpine, a court order signed by Mr. Le that resolved the infringement claims in Microsoft's favor, and the district court's memorandum order. Other sources for the story included a 1999 *Spokesman-Review* story on the Alpine case and conversations with John Nelson, Microsoft's attorney.

In his affidavit, Mr. Sowa related that when he learned that the district court had filed a decision on the Alpine matter, he attempted to contact the parties involved, including Alpine. Neither Alpine nor its counsel returned Mr. Sowa's calls. Mr. Sowa wrote his story after reviewing the Alpine case file. The *Spokesman-Review*'s business editor reviewed the story prior to publication, and in the normal course of business the story would have been reviewed by a copy editor. Mr. Sowa felt it was important to write the story in light of the 1999 reporting on the case.

Mr. Sowa indicated he intended to convey to the reader the result of the district court ruling. Mr. Sowa felt the gist of his story was accurate and cited consistent portions of the district court memorandum order.

Alpine responded to the summary judgment motion with a deposition of Mr. Sowa. In the deposition, Mr. Sowa recalled reviewing the district court's memorandum decision before he spoke to Microsoft's attorney. Mr. Sowa remembered reviewing his previous article about Alpine. Mr. Sowa did not recall reviewing any other court documents in connection with the Alpine case. Mr. Sowa could not recall whether he researched copyright and trademark

law before writing the article. Mr. Sowa remembered consulting several internet resources, including Microsoft's website.

In his deposition, Mr. Sowa consistently defended the accuracy of his news story. In connection with the statement regarding Mr. Le's stipulation, Mr. Sowa said that in hindsight he might have reworded it somewhat. He said it might have been clearer also to have included a reference to the unresolved willfulness matter in the sentence stating that the district court "only determined the amount" of Alpine's liability. CP at 184.

The trial court granted Cowles' summary judgment motion and dismissed Alpine's claim with prejudice. The trial court reasoned the common law fair reporting privilege, as codified in RCW 9.58.050, applied because the challenged story was based on the district court's memorandum decision. The trial court further reasoned no evidence showed Mr. Sowa and/or Cowles acted with knowledge of falsity or reckless disregard as to the truth of the story. The trial court also found the gist or sting of the story to be substantially true, and any minor inaccuracies contained in the story did not materially add to any purported damage Alpine suffered because of the story. And the trial court reasoned that Alpine offered no proof of damages and therefore failed to establish a prima facie case of defamation.

Alpine appealed.

## ANALYSIS

The issue is whether the trial court erred as a matter of law in granting Cowles summary judgment dismissal when it ruled that Cowles was protected by the fair reporting privilege. This issue requires an examination of whether the key offensive statements are provably false, and if so, privileged. In order to adequately address Alpine's concerns we must also discuss the burden of proof and fault.

■■ In reviewing a summary judgment, we engage in the same inquiry as the trial court. *Huff v. Budbill*, 141 Wn.2d 1, 7, 1 P.3d 1138 (2000). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Huff*, 141 Wn.2d at 7. "A material fact is one upon which the outcome of the litigation depends." *Dien Tran v. State Farm Fire & Cas. Co.*, 136 Wn.2d 214, 223, 961 P.2d 358 (1998) (citing *Ruff v. King County*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995)). We review all facts and reasonable inferences in the light most favorable to the nonmoving party. *Huff*, 141 Wn.2d at 7. And de novo review applies to issues of law. *Id.*

■■ To establish a prima facie defamation claim, the plaintiff must show (1) that the defendant's statement was false, (2) that the statement was unprivileged, (3) that the defendant was at fault, and (4) that the statement proximately caused damages. *Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters*, 107 Wn.2d 524, 529, 730 P.2d 1299 (1987); *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981). To defeat a defense summary judgment motion in a defamation action, the plaintiff must raise a genuine issue of material fact as to all four elements of the claim. *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989); *Mark*, 96 Wn.2d at 486; *Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. 550, 27 P.3d 1208 (2001). "The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." *LaMon*, 112 Wn.2d at 197 (citing *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 170, 736 P.2d 249 (1987); *Guntheroth v. Rodaway*, 107 Wn.2d 170, 175, 727 P.2d 982 (1986)).

A defamation claim implicates highly complex issues, particularly when the plaintiff is a private figure. We first examine whether genuine issues of material fact exist as to falsity.

## A. Falsity

■■ At the outset, the defamation plaintiff must prove the offensive statement is "provably false." *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590, 943 P.2d 350 (1997). One way a statement could be provably false is when "it falsely describes the act, condition or event that comprises its subject matter." *Id.* at 591. The statement could be provably false in whole or in part. *Id.* at 592-93. Alpine contends the *Spokesman-Review* story is partly false.

■ To determine whether genuine issues of material fact relating to falsity exist, we must necessarily examine the challenged passages in the story against the available evidence. Fortunately, the record on appeal contains the critical documents from the district court's case file, including Microsoft's complaint, a court order signed by Mr. Le that is described in the story, and the district court's memorandum decision.

The memorandum decision can be best described as a 27-page condemnation of Alpine's violations of Microsoft's trademark and copyright rights. The district court found Alpine sold two counterfeit copies of Microsoft Office Pro 97 software to an investigator on or about October 27, 1998. On December 11, Microsoft sent Alpine a cease and desist letter, which Alpine received on or about December 14. Around December 18, an investigator acquired from Alpine a counterfeit copy of Microsoft Windows 95 software. After receiving the cease and desist letter, and determining the source of the counterfeit Office Pro 97 software was The Yes Man, a nonauthorized distributor, Alpine continued to obtain and distribute Windows 95 software obtained from The Yes Man through at least March 11, 1999. In January 1999, Alpine acquired 19 more units of Windows 95 software from The Yes Man.

Although the district court noted that investigators purchased merely three units of counterfeit software in November and December 1998, it also found evidence inferring

more extensive sales. Alpine's owner deposed that he purchased up to 170 additional units from The Yes Man. Subsequent business records evidence allowed the district court to estimate that Alpine purchased approximately 540 units of Office Pro 97 and Windows 95 from The Yes Man between January and September 1998. The trial court reasoned Alpine "had every reason to suspect, and did suspect, The Yes Man was selling bogus Microsoft software." CP at 52.

The court concluded that Alpine distributed over 500 units of counterfeit Office Pro 97 and Windows 95 software acquired from The Yes Man between January and August 1998. The court awarded Microsoft $250,000 in statutory damages. Additionally, the court awarded Microsoft attorney fees because Alpine had acted "willful[ly]." CP at 67.

When we compare the news story to the district court's memorandum order, we note some fleeting inaccuracies exist in Mr. Sowa's account. Viewed in a light most favorable to Alpine, the nonmoving party, one sentence raises a reasonable inference that buyers purchased counterfeit copies of both Office Pro 97 and Windows 95 software in December 1998. Actually, an investigator bought both Office Pro 97 and Windows 95 in October 1998. Then, after Alpine received the cease and desist letter, an investigator bought solely Windows 95 in December 1998. Accordingly, we conclude a genuine issue of material fact exists as to the partial falsity of that challenged sentence.

▪ Alpine contends the story was also false in stating that Mr. Le "insisted" Alpine had sold fewer than 500 copies. CP at 188. But the district court noted Mr. Le testified in a deposition that he had acquired some 170 copies of software from The Yes Man. The district court further observed with disapproval that Mr. Le testified at trial that he had sold merely three copies to undercover buyers. Then the court noted that Alpine's financial records indicated purchases of more than 500 units of software from The Yes Man. Viewing the evidence in a light most favorable to Alpine, no reasonable inference tends to show the

offensive statement is false. Accordingly, we conclude the statement is not actionable as a matter of law.

Alpine further alleges the general statement that "[t]he sales didn't end" after the cease and desist letter is false. CP at 188. But Alpine concedes selling counterfeit Windows 95 software after receiving the cease and desist letter. While somewhat ambiguous, that statement is not, by itself, false. Consequently, the statement is not defamatory as a matter of law.

Alpine also contends the statement that "Le signed an order acknowledging he had wrongly sold counterfeit software" is false. CP at 188. To be exact, Mr. Le signed an order that partly states, "[p]laintiff's claims against Defendants, and each of them, jointly and severally, with regard to liability are resolved in favor of Plaintiff on its claims of Copy Right and Trademark Infringement." CP at 91. In connection with its claims, Microsoft's complaint alleged that Alpine's sales of counterfeit software were "unlawful" and "wrongful." CP at 76, 78. The district court order at issue establishes that Microsoft prevailed on its claims with the issues of willfulness and damages to be decided at trial. In layman's terms, Mr. Le did indeed acknowledge "wrongly" infringing on Microsoft's intellectual property rights. Viewing the evidence in a light most favorable to Alpine, the challenged sentence, while imprecise, cannot be said to be false as a matter of law.

In sum, Alpine has raised a genuine issue of material fact as to an alleged falsity in a single statement, that Alpine sold counterfeit Office Pro 97 after the cease and desist letter. We turn now to privilege.

## B. Privilege

■ Certain absolute or conditional privileges will shield a defendant from liability for uttering an otherwise defamatory statement. *See, e.g., Richmond v. Thompson*, 130 Wn.2d 368, 376-77, 922 P.2d 1343 (1996); *Engelmohr v. Bache*, 66 Wn.2d 103, 104-07, 401 P.2d 346 (1965); *Moe v.*

*Wise,* 97 Wn. App. 950, 957, 989 P.2d 1148 (1999), *review denied,* 140 Wn.2d 1025 (2000). But an otherwise applicable conditional privilege will offer no protection if the publisher's conduct abuses the privilege. *See, e.g., Lillig v. Becton-Dickinson,* 105 Wn.2d 653, 657-58, 717 P.2d 1371 (1986); *Bender v. City of Seattle,* 99 Wn.2d 582, 601, 664 P.2d 492 (1983); *Moe,* 97 Wn. App. at 963. Here, the trial court reasoned a conditional privilege applied because Mr. Sowa reported on a judicial proceeding. Alpine contends the privilege does not apply to the story, and that if it did, Cowles abused it.

In a typical conditional privilege case, the reviewing court first determines whether the defendant has shown that the challenged communication falls within the asserted privilege. *See Moe,* 97 Wn. App. at 957-62 (discussing whether a common interest conditional privilege applied to a defamatory letter). If the conditional privilege applies, the burden then shifts to the plaintiff to show that the publisher abused the privilege. *See id.* at 962-69 (discussing several ways a defendant can abuse a conditional privilege). If the facts pertaining to the conditional privilege are undisputed in a summary judgment proceeding, the reviewing court may determine as a matter of law whether the asserted privilege applies. RESTATEMENT (SECOND) OF TORTS § 619(1) cmt. a (1977); *see also Moe,* 97 Wn. App. at 957. Whether an abuse has occurred is ordinarily a jury question "unless the facts are such that only one conclusion can reasonably be drawn." RESTATEMENT, *supra,* § 619(2) cmt. b; *see also Moe,* 97 Wn. App. at 962. As will be shown below, the fair reporting privilege at issue here is not a "conditional" privilege in the traditional sense.

Washington has long afforded news media defendants a privilege for reporting on official actions and proceedings. *See, e.g., Herron,* 108 Wn.2d at 179; *Mark v. Seattle Times,* 96 Wn.2d 473, 487-88, 635 P.2d 1081 (1981); *Mark v. KING Broad. Co.,* 27 Wn. App. 344, 348-49, 618 P.2d 512 (1980), *aff'd, Mark v. Seattle Times,* 96 Wn.2d 473 (1981); *Mark v. Fisher's Blend Station,* 27 Wn. App. 916, 919-20, 621 P.2d

159 (1980), *aff'd, Mark v. Seattle times*, 96 Wn.2d 473 (1981); *Moloney v. Tribune Publ'g Co.*, 26 Wn. App. 357, 361, 613 P.2d 1179 (1980); *O'Brien v. Franich*, 19 Wn. App. 189, 193-94, 575 P.2d 258 (1978); *O'Brien v. Tribune Publ'g Co.*, 7 Wn. App. 107, 117, 499 P.2d 24 (1972); *McClure v. Review Publ'g, Co.*, 38 Wash. 160, 168, 80 P. 303 (1905). As one of these earlier cases stated, "[a] newspaper has a qualified or conditional privilege to report legal proceedings provided the publication is a fair and accurate statement of the contents and is made without malice." *Tribune Publ'g Co.*, 7 Wn. App. at 117. A criminal statute enacted in 1909, cited by the trial court but never discussed in a published opinion, sets forth an analogous privilege:

> No prosecution for libel shall be maintained against a reporter, editor, proprietor, or publisher of a newspaper for the publication therein of a fair and true report of any judicial, legislative or other public and official proceeding, or of any statement, speech, argument or debate in the course of the same, without proving actual malice in making the report.

RCW 9.58.050.

 But the more recent Washington opinions discussing the fair reporting privilege rely to some degree on section 611 of *Restatement (Second) of Torts* (Restatement (Second)). *Herron*, 108 Wn.2d at 179; *Seattle Times*, 96 Wn.2d at 487; *KING Broad. Co.*, 27 Wn. App. at 351 n.2; *Moloney*, 26 Wn. App. at 362; *Franich*, 19 Wn. App. at 194. That section of the *Restatement (Second)* states:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

RESTATEMENT, *supra*, § 611; *see also Herron*, 108 Wn.2d at 179; *Seattle Times*, 96 Wn.2d at 487; *Moloney*, 26 Wn. App. at 361 (cases quoting RESTATEMENT, *supra*, § 611). The lack of actual malice language in section 611 is particularly significant and will be discussed in section C below in connection with the fault element.

The purpose of the fair reporting privilege is to serve the public's interest in obtaining information as to what transpires in official proceedings and public meetings. *Herron*, 108 Wn.2d at 179; *Moloney*, 26 Wn. App. at 361; RESTATEMENT, *supra*, § 611 cmt. a. "The privilege is not intended as merely a convenient method of shielding the press from tort liability, but instead is intended to ensure that information is made available to the public concerning what occurs in official proceedings." *Pittman v. Gannett River States Publ'g Corp.*, 836 F. Supp. 377, 382 (S.D. Miss. 1993). The fair reporting privilege allows the news media to publish to the general public reports on any official action or proceeding, or on any public meeting pertaining to a matter of public concern. *Herron*, 108 Wn.2d at 179; *Moloney*, 26 Wn. App. at 361; RESTATEMENT, *supra*, § 611 cmt. b.

Significantly, the fair reporting privilege is "somewhat broader in its scope" than the conditional privileges set forth in sections 594 through 598A of *Restatement (Second) of Torts*. RESTATEMENT, *supra*, § 611 cmt. a; *see also Mattson v. Chronicle Publ'g Co.*, 156 Ill. App. 3d 613, 509 N.E.2d 150, 152, 108 Ill. Dec. 724 (1987). The fair reporting privilege applies where the communication is attributed properly to an official proceeding and the report is an accurate report of that proceeding or a fair abridgement. RESTATEMENT, *supra*, § 611 cmts. d, f; *see also Ditton v. Legal Times*, 947 F. Supp. 227, 230 (E.D. Va. 1996), *aff'd*, 129 F.3d 116 (4th Cir. 1997). The fair reporting privilege may protect the publisher even if the publisher does not believe defamatory statements contained in the official report to be true or even knows the defamatory statements to be false. RESTATEMENT, *supra*, § 611 cmt. a.

Accordingly, to determine whether a communication falls within the fair reporting privilege, we engage in two inquiries: (1) whether the report is attributable to an official proceeding; and (2) whether the report is accurate or a fair abridgement. RESTATEMENT, *supra*, § 611 cmts. d, e, f; *see also Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 254

(4th Cir. 1988); *Ditton*, 947 F. Supp. at 230. "If the report of a public official proceeding is accurate or a fair abridgment, an action cannot constitutionally be maintained, either for defamation or for invasion of the right of privacy." RESTATE-MENT, *supra*, § 611 cmt. b; *see also Ditton*, 947 F. Supp. at 230.

Given these authorities, the fair reporting privilege is not subject to the same abuse analysis as conditional privileges set forth in *Restatement (Second)* sections 594 through 598A. *Compare Ditton*, 947 F. Supp. at 230 (analyzing applicability of the section 611 privilege) *with Moe*, 97 Wn. App. at 957, 962-64 (addressing applicability and abuse of common interest conditional privilege). Abuses of sections 594-598A conditional privileges occur when the publishers' conduct specifically violates in some way the purpose or scope of the asserted privilege. *See Moe*, 97 Wn. App. at 962-63 (discussing abuse of common interest conditional privilege); RESTATEMENT, *supra*, §§ 599-605A.

By contrast, the fair reporting privilege either applies or it does not. So long as the publication is attributable to an official proceeding and is an accurate report or a fair abridgment thereof, it is privileged. *Rushford*, 846 F.2d at 254; *Ditton*, 947 F. Supp. at 230; RESTATEMENT, *supra*, § 611 cmt. b.

■ Accordingly, when applying the fair reporting privilege, we must first determine whether the offensive statements are attributable to an official proceeding. In this connection, the fair reporting privilege extends to reports of official actions, including actions arising from judicial proceedings. RESTATEMENT, *supra*, § 611. Here, the challenged statements are easily traceable to the district court's proceedings as reflected by Microsoft's complaint, the court order signed by Mr. Le and reported in the story, and the district court's memorandum decision. Given the record, we conclude as a matter of law that the challenged statements are attributable to an official proceeding. *See Rushford*, 846 F.2d at 253-54; *Ditton*, 947 F. Supp. at 230.

Next, we consider a closer question, whether the challenged statements are an accurate report, or a fair abridgment of the district court's proceedings. Cowles does not contend its brief story is a complete report of the district court's 27-page memorandum decision. In essence, Cowles argues the report is a fair abridgement. Alpine contends otherwise.

For a report to be a fair abridgment of an official proceeding, surgical precision is not required so long as the report is substantially accurate and fair. RESTATEMENT, *supra*, § 611 cmt. f. "It is not necessary that it be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting." *Id.* "It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." *Id.* In the summary judgment context, the plaintiff will not overcome the fair reporting privilege if the reviewing court determines as a matter of law that the challenged report is a fair abridgement. *See Kenney v. Scripps Howard Broad. Co.*, 259 F.3d 922, 924 (8th Cir. 2001).

" 'A publisher fairly abridges the judicial proceeding if the report renders a "substantially correct" account of the proceeding.' " *Ditton*, 947 F. Supp. at 230 (quoting *Rushford*, 846 F.2d at 254-55). Under this standard, the publisher must not edit and delete an otherwise accurate report so as to misrepresent the proceeding and thus mislead the reader. RESTATEMENT, *supra*, § 611 cmt. f. And the publisher must not add material so as to cast a person in a defamatory light. *Id.* To determine the fairness of the report, we must read the article as a whole. *Id.*; *see also Ditton*, 947 F. Supp. at 230-31.

Here, a passage in the *Spokesman-Review* story states the district court ordered Alpine to pay damages for the sales of both Office Pro 97 and Windows 95 counterfeit software after December 1998. The passage is partially inaccurate; the sales at issue were of Windows 95 counterfeit software alone. But if the story is read in its entirety,

the error is not substantial. The story contained two references to Mr. Le's claim that he stopped selling Office Pro 97 after the cease and desist letter from Microsoft. Moreover, the story contains a direct quote from the district court order regarding " 'Le's decision to continue buying Windows 95 from the Yes Man.' " CP at 188. Viewed in context with the entire story, the challenged passage is substantially accurate and fair as a matter of law.

Another sentence states Mr. Le signed an order acknowledging he "wrongly" sold counterfeit software. CP at 188. As discussed in section A, this statement is not provably false. Because the statement is not susceptible to a defamatory meaning, no need exists to discuss whether the fair reporting privilege applies. *See* RESTATEMENT, *supra*, § 600 (applying privilege to otherwise defamatory statements). Nevertheless, for the sake of argument, we examine whether the statement is substantially accurate and fair.

As noted earlier, Microsoft alleged in its complaint that Alpine unlawfully and wrongfully infringed on its intellectual property rights. Mr. Le signed an order stating that Microsoft prevailed on all of its claims of copyright infringement, with damages and willfulness to be decided later. The statement in the *Spokesman-Review* story may be imprecise, but it is substantially accurate and fair when viewed in context with its sources and the rest of the story. And, as discussed, other challenged statements in the story are not false, and thus not actionable as a matter of law. Although the fair reporting privilege applies, we next discuss fault to facilitate a full understanding of the issues implicated in this appeal.

## C. Fault and Burden of Proof

No element of defamation is more contentious than fault, and the closely related issue of burden of proof. One thing is clear; a public figure plaintiff must prove by clear and convincing evidence that the defendant uttered the offen-

sive statement with actual malice, that is, with knowledge of falsity or reckless disregard of the truth or falsity of the statement. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 169-70, 736 P.2d 249 (1987). It has not been suggested Alpine is a general or limited-purpose public figure. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351-52, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

Pinpointing the proper standards for a private figure plaintiff is far more challenging. Numerous Washington cases have stated as a general rule that a private figure plaintiff must prove negligence by a preponderance of the evidence to establish a prima facie defamation claim. *Bender v. City of Seattle*, 99 Wn.2d 582, 599, 664 P.2d 492 (1983); *Taskett v. KING Broad. Co.*, 86 Wn.2d 439, 445, 546 P.2d 81 (1976); *Moe v. Wise*, 97 Wn. App. 950, 957, 989 P.2d 1148 (1999), *review denied*, 140 Wn.2d 1025 (2000); *Haueter v. Cowles Publ'g Co.*, 61 Wn. App. 572, 582-84, 811 P.2d 231 (1991); *see also LaMon v. Butler*, 112 Wn.2d 193, 206-08, 770 P.2d 1027 (1989) (Utter, J., dissenting). When privilege is claimed, the issue of fault requires further refinement.

A number of Washington cases hold that if the offensive communication falls within a certain conditional privilege, the private figure plaintiff must show actual malice to establish an abuse of the privilege. *Lillig v. Becton-Dickinson*, 105 Wn.2d 653, 658, 717 P.2d 1371 (1986); *Bender*, 99 Wn.2d at 601; *Seattle Times*, 96 Wn.2d at 482; *Moe*, 97 Wn. App. at 963. If the plaintiff must show actual malice to establish abuse, the standard of proof is convincing clarity. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Richmond v. Thompson*, 130 Wn.2d 368, 385-86, 922 P.2d 1343 (1996); *Lillig*, 105 Wn.2d at 658; *Moe*, 97 Wn. App. at 963. This higher quantum of proof is required by the First Amendment, or otherwise necessary to protect the public policy interests supporting the privilege. *N.Y. Times*, 376 U.S. at 285-86; *Moe*, 97 Wn. App. at 963-64.

The differing burden of proof applies at the summary judgment stage as well as at trial. *Herron*, 108 Wn.2d at 170; *Wood*, 107 Wn. App. at 568. If the higher burden of proof applies, "the plaintiff must offer evidence sufficient to permit a reasonable trier of fact to find clear and convincing proof" of abuse. *Herron*, 108 Wn.2d at 170 (citing *Liberty Lobby*, 477 U.S. at 255-56). Under the clear and convincing standard, a mere scintilla of evidence, evidence that is merely colorable, or evidence lacking significant probative value will not suffice to defeat a defense summary judgment motion. *Herron*, 108 Wn.2d at 170.

Here, the trial court applied an actual malice standard set forth in RCW 9.58.050, a statute enacted in 1909. Given the many changes in defamation law since that time, the trial court's reliance on that statute bears close scrutiny. The Washington Supreme Court has stated consistently that negligence is the usual standard in private figure defamation. *LaMon*, 112 Wn.2d at 197; *Bender*, 99 Wn.2d at 599; *Seattle Times*, 96 Wn.2d at 483; *Taskett*, 86 Wn.2d at 445. The negligence standard better protects the private citizen's right to recover for injury to his or her reputation caused by overzealous news coverage. *See Seattle Times*, 96 Wn.2d at 482. According to our Supreme Court:

> "[A] private individual, who is neither a public figure nor official, may recover actual damages for a defamatory falsehood, concerning a subject of general or public interest, where the substance makes substantial dangers to reputation apparent, on a showing that in publishing the statement, the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect."

*Seattle Times*, 96 Wn.2d at 483 (quoting *Taskett*, 86 Wn.2d at 445 (emphasis omitted)).

The negligence standard adopted in *Taskett* is consistent with the standard of fault set forth in connection with section 611 of *Restatement (Second)*: "If the plaintiff is a private person, he must show the existence of fault amounting at least to negligence in regard to the falsity and the

defamatory character of the statement." RESTATEMENT, *supra*, § 611 cmt. b. "The plaintiff in this situation must show fault by the publisher in not acting reasonably to insure that the report is accurate and complete or a fair abridgement." *Moloney*, 26 Wn. App. at 362 (citing RESTATEMENT, *supra*, § 611 cmt. b).

As noted, section 611 of *Restatement (Second)* does not include an actual malice requirement, and there is a reason for that. The first version of section 611, drafted in 1938, had a fault requirement analogous to actual malice. *Tepper v. Copley Press, Inc.*, 308 Ill. App. 3d 713, 721 N.E.2d 669, 673, 242 Ill. Dec. 390 (1999). *Restatement (Second)* removed the malice requirement from section 611 and replaced it with a standard consistent with United States Supreme Court cases holding that a private figure plaintiff is held to a standard of fault lower than actual malice. RESTATEMENT, *supra*, § 611 cmt. b; *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 493-95, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975); *Gertz*, 418 U.S. at 347-48.

At this point, we note Cowles relies heavily on a few Washington cases applying an actual malice standard. One of these cases is inapplicable because the plaintiff was a public official. *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 776 P.2d 98 (1989). And while the other cases involve certain conditional privileges, they do not discuss the fair reporting privilege implicated in this case. *See, e.g., Lillig*, 105 Wn.2d at 657-58; *Moe*, 97 Wn. App. at 963. Moreover, these conditional privilege cases derive their actual malice standard from section 600 of *Restatement (Second)*, which pertains to an array of conditional privileges not at issue here. *See Lillig*, 105 Wn.2d at 657-58 (applying section 600 actual malice standard to employer communications qualified privilege); *Bender*, 99 Wn.2d at 601-02 (adopting section 600 actual malice standard for police information qualified privilege); *Moe*, 97 Wn. App. at 961-63 (adopting section 600 actual malice standard for common interest qualified privilege); *see also* RESTATEMENT, *supra*, §§ 594-598A (describing qualified privileges falling under section 600).

In this connection, *Restatement (Second)* drafters expressly provided that section 600, the actual malice standard, does not apply in the fair reporting context. RESTATEMENT, *supra*, § 600 cmt. c; *see also Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1086 n.27 (3d Cir. 1988) (noting section 600 excludes the fair reporting privilege); *Pittman*, 836 F. Supp. at 384 n.11 (noting that the section 611 privilege "is to be distinguished from other conditional privileges which are lost upon showing of malice, in the traditional sense"). Rather, *Restatement (Second)* provides the standard of fault in the fair reporting context depends on the status of the plaintiff as a public or private figure. RESTATEMENT, *supra*, § 611 cmt. b. "If the plaintiff is a private person, he must show the existence of fault amounting at least to negligence in regard to the falsity and the defamatory character of the statement." *Id.* (citing RESTATEMENT, *supra*, § 580B). "The constitutional requirement of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgment." *Id.*

Some states applying section 611 require the private figure plaintiff to prove negligence. *See, e.g., Wilson v. Slatalla*, 970 F. Supp. 405 (E.D. Pa. 1997) (relying on Pennsylvania law in reasoning negligence standard applied to private figure plaintiff allegedly defamed on matter of public importance); *Ortega v. Post-Newsweek Stations, Fla., Inc.*, 510 So. 2d 972, 975 (Fla. Dist. Ct. App. 1987); *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 331 (Minn. 2000) (reasoning private figure plaintiff must prove negligence to defeat section 611 privilege). But some other jurisdictions require proof of actual malice to defeat the fair reporting privilege. *See, e.g., Stem v. Gannett Satellite Info. Network, Inc.*, 866 F. Supp. 355, 360 (W.D. Tenn. 1994); *Sedore v. Recorder Publ'g Co.*, 315 N.J. Super. 137, 716 A.2d 1196, 1209 (1998) (applying section 600 actual malice standard to the fair reporting privilege); *but see also Schiavone Constr.*, 847 F.2d at 1085 n.25 (noting the inconsistency between the New Jersey actual malice standard

applied in fair reporting cases and standard set forth in connection with section 611).

In any event, *Restatement (Second)* was published in 1977. The standard of fault set forth in connection with section 611 takes into account the public figure versus private figure dichotomy arising from *New York Times* and *Gertz* . *See* RESTATEMENT, *supra*, § 611 cmt. b. But, the United States Supreme Court has since clarified that it is appropriate to consider also whether the communication pertaining to a private figure touches upon a matter of public concern. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 755-56, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985); *see also Haueter*, 61 Wn. App. at 583. If the plaintiff is a private figure and the defamatory message addresses a matter of purely private concern, the plaintiff need not show actual malice to recover damages. *Dun & Bradstreet*, 472 U.S. at 763.

We have previously reasoned a negligence standard should apply in private figure—private matter defamation cases. *Haueter*, 61 Wn. App. at 583; *see also Dunlap v. Wayne*, 105 Wn.2d 529, 534-35, 716 P.2d 842 (1986) (holding that a private figure plaintiff offended by a statement about his private affairs should not be held to convincing clarity standard of proof). On the other hand, if the plaintiff is a private figure and the offensive statement pertains to an issue of public concern, "the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern." *Hepps*, 475 U.S. at 775. We have not articulated a definitive standard of fault for private figure—public concern defamation cases. *See Dunlap*, 105 Wn.2d 529, 534-35 (suggesting convincing clarity standard of proof would apply if offensive statements about a private figure plaintiff addressed a matter of public concern).

 Considering the authorities, we conclude the actual malice standard of fault should apply in cases where a private figure is offended by a statement pertaining to a matter of public importance. *See Dunlap*, 105 Wn.2d at 534-35; *Haueter*, 61 Wn. App. at 583-84; *see also Keenan v. Allan*, 889 F. Supp. 1320, 1388 n.90 (E.D. Wash. 1995) (interpreting *Haueter* to require a convincing clarity standard of proof where the plaintiff is a private figure and the alleged defamatory statement addressed an issue of public concern). This approach preserves the constitutionally-based distinction between matters of public and private concern in private figure defamation cases. *See Dunlap*, 105 Wn.2d at 534-35; *Haueter*, 61 Wn. App. at 583-84. Applying a negligence standard in both private and public contexts renders that distinction meaningless.

Accordingly, an actual malice standard of fault should apply where a private figure plaintiff is allegedly defamed by a statement pertaining to a matter of public concern. *See Keenan*, 889 F. Supp. at 1388 n.90. If the communication pertains to a matter of purely private concern, the negligence standard applies. *Dunlap*, 105 Wn.2d at 535; *Haeuter*, 61 Wn. App. at 583. Next, we must determine whether the *Spokesman-Review* story pertained to a matter of public concern.

Whether an allegedly defamatory statement pertains to a matter of public concern depends on the content, form, and context of the statement as shown by the entire record. *Dun & Bradstreet*, 472 U.S. at 761. Here, the challenged story relates to a court decision resolving an intellectual property dispute between a major software manufacturer and a local retailer. Viewed narrowly, the story pertains to a private dispute between two business entities. In a broader context, however, the dispute touches on a matter of public importance, software piracy. The public concern is heightened by the fact that Alpine apparently sold counterfeit software to the general consumer. In an age where the use of personal computers is widespread, the retail distribution of pirated software is a matter of acute importance to general consum-

ers. This is a matter where the First Amendment plays a role in ensuring the free flow of information to the public. *See Dun & Bradstreet*, 472 U.S. at 762. Accordingly, the *Dun & Bradstreet* factors indicate the Alpine case was a matter of public concern deserving of heightened protection. *See id.*

In light of the foregoing, Alpine must show Cowles acted with actual malice, i.e., that it acted with actual knowledge of the falsity, or that it acted with reckless disregard as to the truth or falsity of the story. *Herron*, 112 Wn.2d at 775. This requires evidence that the publisher was plagued with serious doubts as to the truth of the statement. *Id.* Mere failures to investigate or mistakes made in an investigation leading to a news story will not prove recklessness. *Id.* at 777. The clear and convincing standard of proof applies, even at the summary judgment stage. *Id.* at 775-76.

Assuming for discussion one or more of the challenged statements were too inaccurate for purposes of the fair reporting privilege and viewing the record in a light most favorable to Alpine, not even a scintilla of evidence indicates Mr. Sowa or Cowles had knowledge of any alleged falsity or that they were reckless. To the contrary, the record shows Mr. Sowa attempted to verify his facts and ran the story by the paper's business editor. Consequently, Alpine has failed to show a genuine issue of material fact exists as to Cowles's alleged fault.

## CONCLUSION

Having concluded the fair reporting privilege applies and there is no evidence of actual malice, we need not discuss damages. Accordingly, we hold the trial court did not err in granting Cowles's summary judgment motion.

Affirmed.

SWEENEY and KURTZ, JJ., concur.