## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| LAW OFFICE OF JOHN RANDOLPH, PLLC, a Washington professional limited liability company; JOHN MARSHALL RANDOLPH JR., an individual residing in the State of Idaho,<br><br>Respondents,<br><br>v.<br><br>EWU MEDIA LLC, a domestic limited liability company; ROBERT FORNEY, an individual; CARRIE GRANDFIELD, an individual; A.T. MATHIS, Agent of EWU MEDIA LLC; and DOES 1-10,<br><br>Appellants. | No. 87958-8-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — Attorney John Randolph, who is bipolar, had a mental health episode on August 3, 2021. During the incident Randolph approached a child at a public park and tried to persuade the child to go boating or parasailing with him. When police responded, Randolph made several nonsensical statements, including an inaccurate belief that he was the child's father. According to Randolph, this conduct is consistent with the occurrence of a manic episode associated with bipolar disorder.

The matter resolved with Randolph pleading guilty to disturbing the peace. About two years later, Explore with Us (EWU) Media posted a 14-minute video on YouTube and Facebook, consisting of segmented police body camera (bodycam) and security

camera footage of the August 3 incident. Portions of the video include EWU Media's voice-over narration that added information beyond what was depicted in the footage, including that Randolph "does, in fact, have a bit of dirt on him, so to speak," "apparently" is "hiding a rather tumultuous past," and could "relapse" at any time.

The posting received millions of views and thousands of comments, including references to Randolph being a pedophile. Randolph received harassing emails and voicemails, including a death threat. He eventually closed his law practice because of the constant harassment from the public. Randolph sued EWU Media, asserting multiple claims based on his assertion that the narration over the video was false and defamatory because it includes statements leading viewers to believe Randolph is a pedophile who could relapse at any moment.

EWU Media appeals the trial court's denial of its motion to dismiss under the Uniform Public Expression Protection Act (UPEPA). Because a reasonable jury could find that the "gist" of EWU Media's voice-over narration was that Randolph has a history of child predation, which is an unsupported statement that Randolph denies, genuine questions of material fact remain as to whether false statements caused harm distinct from the true portions of EWU Media's video. We affirm.

FACTS

In 2020 Randolph, an attorney, was diagnosed with bipolar disorder. According to his health care provider, "Bipolor disorder is a mental illness that causes unusual shifts in a person's mood, activity levels, and concentration." People with this illness may "engage in behaviors that are out of character for them, often without recognizing their effects." In Randolph's case, this has included "disordered thinking that makes it

challenging for him to discern reality from fiction. He struggles to think clearly and logically, might have unusual or intense ideas, disrupted sleep, confused speech, and difficulty communicating."

Around July 2021, Randolph stopped taking his prescribed medication in consultation with his mental health provider due to reported side-effects and recent changes in circumstances. On August 3, 2021, Randolph had an incident involving communicating with a child he did not know but claimed to know at a local park in Coeur d'Alene, Idaho near one of his law offices. Randolph attempted to persuade the child to go on a boat or parasailing with him. Police were called and Randolph was arrested for enticing of children. Much of the incident was captured on responding police officers' bodycams and local security cameras. Randolph's mental health care provider reviewed the videos and inpatient medical records from immediately after the incident and concluded that they reflect events consistent with the occurrence of a manic episode.

An officer who was present during Randolph's incident stated in an incident report, "I noticed when John told me things, he would either have great detail or extremely general statements which gave me the impression he was not being truthful." Another officer indicated, "As I tried to make sure I had [Randolph's] story down accurately, he began answering 'yes' to everything I said. I did not want to confuse the situation anymore than it already was, so I stopped asking questions" and "I felt something was not right, and John was not being truthful." Randolph eventually pleaded guilty to an amended charge of disturbing the peace in February 2022.

In November 2023 EWU Media posted a 14-minute YouTube video titled "Bodycam Footage Reveals a Parent's Worst Nightmare," which presented narration

over segments of police bodycam and security camera footage of Randolph during the

August 3, 2021, incident. The edited video footage begins with 30 seconds of footage

cut between Randolph interacting with officers and statements from a child. For these

first thirty seconds, the officer's statements are captioned at the bottom of the screen in

large white font and Randolph's statements are captioned in the center of the screen in

large red font.

> FIRST OFFICER: You're the child's dad?

> RANDOLPH: Yeah. She hasn't seen me in a very long time, so she kind of freaked out and said, "Where's my mom? You're not my dad."

> FIRST OFFICER: What's mom's name?

> RANDOLPH: Might be Isis [phonetic]. Might be Katrina.

> SECOND OFFICER: You're trying to get a kid to come with you somewhere that is not where his parents are. That's not acceptable here or anywhere.

> CHILD: He said "Hi," and I said, "Do I know you?"

> RANDOLPH: Yeah, the kid was probably just very confused.

> SECOND OFFICER: Are you attracted to kids?

> RANDOLPH: Well, they're beautiful creatures of God. Yeah, I'm attracted to kids.

> SECOND OFFICER: You are?

> RANDOLPH: Mm-hmm.

> FIRST OFFICER: You are being detained until we figure out what's going on.

> RANDOLPH: Okay, Perfect. That's a good idea. Thank you.

> Then, a disclaimer appears on the screen for less than a second that reads:

> All information contained in this video presentation is provided for entertainment purposes only and is not to be relied upon as legal advice or opinion on any matter, in any jurisdiction. The authors leave any and all

conclusions to individual members of the audience. The author offers no statements of fact beyond those available through diligent private research or through information freely available in the public record. To the extent that pending or settled criminal matters or crimes or possible crimes are discussed in this video presentation, all parties or defendants are presumed innocent unless proven guilty in a court of law. To the extent that any pending or settled civil matters are discussed in this video presentation, all parties or defendants are presumed not liable unless proven liable in a court of law. The materials in this video presentation are copyrighted and therefore copying, reproduction, or distribution of any part of this video is prohibited unless in accordance with applicable statute and case law. Copyright for material incorporated and presented under Fair Use is retained by the original author or copyright holder, where applicable.

Thereafter, the narration begins, which also is captioned at the bottom of the screen:

NARRATOR: On Tuesday, August 3, 2021, a parent's worst nightmare shockingly comes to life when a strange man tries to lure a 10-year-old child onto a nearby boat. Terrified, the young girl attempts to flee from the man and approaches a few employees working at Coeur d'Alene Idaho Parasailing.
    The child quickly hides behind the workers and shakily tells them of the horrifying ordeal to which the owner, Benjamin Rodriguez, discreetly dials 911. However, the disturbing nightmare is far from over as police soon come face to face with their deranged suspect, who will go on to make one of the most shocking confessions ever caught on tape when authorities arrive on the scene.
    Benjamin frantically makes his way to an officer, wasting no time in divulging the twisted tale.

Rodriguez is seen talking with police and stating, "[t]his girl that's over there, the girl's[1] crying, coming up at the house saying, this guy is trying to take her. This guy claims it's his daughter. The girl is not going with him." Rodriguez points an officer in Randolph's direction and says, "I'm getting the picture that this guy is trying to take her, so, I'm like, we'll still try to find a parent."

---

[1] The child that was involved was a 10-year-old boy. The video blurs the faces of children.

5

Rodriguez also relayed to officers that upon walking with Randolph and "trying to play along," Randolph said "I'm good, I'm good, I can go, I can go." Rodriguez reported that Randolph said a random woman was the child's mom, but upon Rodriguez asking the woman if she was missing a child, she said no and that she did not know the child or Randolph.

Rodriguez stated that Randolph tried to leave again but Rodriguez told him he was not leaving because he was trying to take the child. Rodriguez also asked Randolph what the child's mom looked like and Randolph could not remember but stated "I'm her husband. Well, we haven't been married in three years. We're not quite married. We're not actually going to get married, but we might."

The video then shows bodycam footage of police officers questioning Randolph with Rodriguez standing behind him.

> FIRST OFFICER: How did you come across the child? You said she was down – down there by the parasail, right?
>
> RANDOLPH: I don't think so.
>
> …
>
> FIRST OFFICER: … Now, you came across a child down by the parasailing thing, right?
>
> RANDOLPH: (Nods head up and down).
>
> FIRST OFFICER: So, what happened next?
>
> RANDOLPH: I don't remember.
>
> FIRST OFFICER: You don't remember? Okay. Have you been drinking today?
>
> RANDOLPH: No.
>
> FIRST OFFICER: You took her or you brought her to somebody?

RANDOLPH: I didn't bring her. She was running down by herself.

FIRST OFFICER: Running down by herself? Okay.

RANDOLPH: Yeah and um. We came up here and she was down on the docks, so I thought – like, I thought she was still on the dock, but I don't know. He says that she was not.
    Where did you see her? [looking to Rodriguez behind him]

BENJAMIN RODRIGUEZ: She came up to us. You guys both came up to us.

…

FIRST OFFICER: … So, you took the child to the parasailing people?

RANDOLPH: No. The child ran down there.

FIRST OFFICER: Okay. So how did you get involved in this?

RANDOLPH: I just saw the child run down there.

FIRST OFFICER: Okay. Did you try and stop the child or anything?

RANDOLPH: Huh-uh. The child just ran down there. She said I was – well, I remember saying I'm her dad because that's true um.

FIRST OFFICER: You're the child's dad?

RANDOLPH: Yeah. She hasn't seen me in a very long time –

FIRST OFFICER: Okay.

RANDOLPH: – so I apologize um. But we were supposed to do visitation um with her mom and see the – the kid, you know? And um so, it was like the first time seeing her for a long time, and so she kind of freaked out and said, "Where's my mom? You're not my dad."
    I'm sorry. It probably wasn't the best way to, like, have a first visitation. But she found her mom and – on the grass over there, and he saw that.

[Randolph points to Rodriguez behind him.]

[RANDOLPH:] Yeah, the kid was probably just very confused.

[Rodriguez is no longer seen standing behind Randolph.]

NARRATOR: Despite John's explanation for his disturbing actions, he will soon twist his words into another attempt at clearing his name. However, police are about to learn that John is not who he claims to be. In fact, he's hiding a most disgusting secret, and he won't be able to conceal it for much longer.

During the narrator's statement above, the bodycam footage continues playing, showing Randolph, whose mouth is moving, but the narration speaks over him. The narration ends and picks back up with a conversation between Randolph and an officer.

FIRST OFFICER: Just out of curiosity, why would you just show up and be like, "Hey, I'm your dad?"

RANDOLPH: No, she exchanged – like, I met her in front of the parking (inaudible) over there.

FIRST OFFICER: Okay. So, you met her over there.

RANDOLPH: Uh-huh.

…

FIRST OFFICER: … And then when you met her and the child – who's the mom, actually? What's mom's name?

RANDOLPH: Might be Isis. Might be Katrina. Might be Mary.

FIRST OFFICER: Okay.

RANDOLPH: I don't remember.

FIRST OFFICER: Was the little girl with you over there when – when you contacted them at the bench?

RANDOLPH: Yes.

FIRST OFFICER: Okay. And then so did she take off running at that point?

RANDOLPH: Um, yeah.

FIRST OFFICER: Okay. And then she ran – that's when she ran down the – the dock there?

RANDOLPH: [Nodding] Yeah.

FIRST OFFICER: Okay. John, right now I'm going to detain you.

RANDOLPH: Okay.

FIRST OFFICER: All right. You're not under arrest at this point, but you are being detained –

RANDOLPH: Okay.

FIRST OFFICER: – until we figure out what's going on.

RANDOLPH: Okay. Perfect. That's a good idea. Thank you.

Then, as police are seen detaining Randolph, the narration adds:

John is oddly chipper for being detained, and his strange demeanor makes for an all-the-more disturbing investigation. However, this would only be amplified when police have a chance to speak with the victim, who turns out to actually be a ten-year-old boy, despite what John claims. It's heartbreaking to hear the child relive the traumatic experience.

Then, the next video segment, which is blurred, captures two children and an adult

speaking with police.

CHILD: Basically um, he was over there, and I was jumping off the dock and getting back on. And he was talking to my brother, and I don't know what they were saying, but he said, "Hi."
    And I said, "Do I know you?"
    And he said something about me growing super fast, like –

ADULT FEMALE: Growing super fast?

CHILD: – like he saw me when I was a baby. And he said he growed super slow. And then he high fived me and we were walking down, and he wanted – he said he owned all those boats, and then he wanted me to go on – boating with him and then he wanted to do the parasail with me.
    And then I went to these people. And he also said that he was my mom's husband, and I was – he was – I was his son. And then he said something about like being together for a million years.

SECOND OFFICER: Did the guy say anything to you, dude? What did he say?

SECOND CHILD: Um he just kept on calling me – he literally let me pick what names he was going to talk (inaudible).

The next video segment, no longer blurred, shows Rodriguez talking through the security camera footage with an officer.

NARRATOR: The two brothers were swimming near the docks at Independence Point in Coeur d'Alene, Idaho, when John creepily began to talk to the children. But the brave ten-year-old immediately knew what to do and quickly asked for help from Benjamin and his employees. Here, Benjamin gives a detailed recollection of those shocking moments captured by the security camera.

RODRIGUEZ: The kid and that dude.

FIRST OFFICER: Yep.

RODRIGUEZ: This kid is trying to get help. This dude is trying to convince him to –

FIRST OFFICER: Right.

RODRIGUEZ: – not get help, right? So, we're getting – we're winding up for the day –

FIRST OFFICER: Yup.

RODRIGUEZ: – getting things done. And uh this is his last chance, trying to convince this kid to not –

FIRST OFFICER: Get help.

RODRIGUEZ: Here comes the kid, comes over here. And I'm like "Hey, do you have any questions," thinking they're you know, parasail customers or something.

FIRST OFFICER: Right.

RODRIGUEZ: And this kid is now crying, and he comes over to me and he's like –

FIRST OFFICER: Hiding behind him.

RODRIGUEZ: He said, "That's not my dad." And "Yes, I'm his dad. He just got up from a nap. He's groggy. He's – he thinks like this when he wakes up from a nap."

And we're just like, what the crap?

He's like, "Well, you guys can – you guys can leave" – or "You guys can stay here. I'm going to go."

FIRST OFFICER: (Inaudible) get the mom.

RODRIGUEZ: And I'm like, "Riley, you stay here with this kid. I'm gonna go follow this guy."

…

RODRIGUEZ: … I hope they get a lot of dirt on him. Get that creeper out of here, man.

NARRATOR: As the sickening investigation continues, we'll learn that John does, in fact, have a bit of dirt on him, so to speak. However, in no way does it compare to his upcoming confession that will stop authorities dead in their tracks. Back at the police vehicle, John tells an officer that he works close by, but authorities could have never guessed the suspect's profession.

Randolph then tells officers that he is a lawyer, and his law office is nearby. The

narration again interjects:

Shockingly, John is telling the truth. He informs the officer that he opened his practice, the Law Office of John Randolph, in Spokane, Washington, back in 2015 although he recently moved to Idaho only one year prior to his current encounter with police. According to several reviews, John is held in high regard as an attorney, even winning a Client's Choice award in 2020.

However, there's a side of the lawyer that hasn't made its way into the light just yet, but this will take a drastic turn in just a matter of minutes.

Officers ask Randolph more about his law practice and Randolph tells officers that he

can show them his law office and describes it as having a swimming pool, a jacuzzi,

tennis courts, a parking garage, a big leather couch, and art. Randolph also tells officers

that he does not practice criminal law "much because it's kind of weird, like the

criminals." The narrator then states: "According to his website, John practices personal injury, general litigation and family law. Ironically, it now looks like he may be the one who needs an attorney and for the most sickening reason."

The next video segment again cuts to Randolph speaking with officers.[2]

SECOND OFFICER: So, the boy you were following, do you own these boats right here. Do you own any boat?

RANDOLPH: Yea, all of them.

SECOND OFFICER: You own all of them?

RANDOLPH: Mm-hmm.

SECOND OFFICER: Okay. Did you ask that boy to go on the boats with you, for a boat ride?

RANDOLPH: I don't remember to be honest. Maybe. Yeah. Yeah, I think so.

SECOND OFFICER: Okay. Why would you ask him to go on a boat with you?

RANDOLPH: He's my stepson.

SECOND OFFICER: I thought you were saying that it was a girl, though.

RANDOLPH: I don't remember. I'm sorry. I've got a weird memory about this.

SECOND OFFICER: Did you want to go parasailing with him, too?

RANDOLPH: Yeah, that would have been fun.

SECOND OFFICER: Well, did you say that?

RANDOLPH: Probably.

SECOND OFFICER: Okay. Why would you – why would you ask him to go parasailing with you?

---

[2] Portions of the video, which capture the officer's notes, are blurred.

RANDOLPH: Because it's fun. It's like this big parachute. You go up into the air, and you look down at the lake, and it's amazing, and there's crystal waters that look like diamonds and—

SECOND OFFICER: Well, that's not your son.

RANDOLPH: Oh, it isn't? Okay. I'm sorry.

SECOND OFFICER: Or daughter.

RANDOLPH: Okay. I'm sorry.

SECOND OFFICER: That's not – you don't tell me sorry. That's your fault. You're trying to get a kid to come with you somewhere that is not where his parents are. That's not acceptable here or anywhere.
        You guys were talking and call him Charle – Charlie? Do you even have a stepson?

[The video is no longer blurred.]

FIRST OFFICER: Have you ever been diagnosed with any mental illness?

RANDOLPH: Yes.

FIRST OFFICER: What were you diagnosed with?

RANDOLPH: Bipolar.

FIRST OFFICER: Bipolar? Are you taking any medications for that?

RANDOLPH: Not currently.

FIRST OFFICER: Not currently? Are you supposed to be taking any medications?

RANDOLPH: No. My doctor told me no.

NARRATOR: Apparently, John is allegedly hiding a rather tumultuous past. A woman who would like to remain anonymous asserts that the suspect is a ticking time bomb. You don't know when he's going to relapse. Just wait until he unveils his most sick and twisted confession.

During this narration the words "TICKING TIME BOMB" and "RELAPSE" appear

in red in the center of the screen.

13

SECOND OFFICER: Do you come down here often?

RANDOLPH: Yeah.

SECOND OFFICER: Do you talk to kids often?

RANDOLPH: No.

SECOND OFFICER: Why today?

RANDOLPH: It's my birthday.

SECOND OFFICER: It's your birthday?

RANDOLPH: Yeah.

SECOND OFFICER: Are you attracted to kids?

RANDOLPH: No.

SECOND OFFICER: Really?

RANDOLPH: Well, they're beautiful creatures.

SECOND OFFICER: Huh?

RANDOLPH: Yeah.

SECOND OFFICER: What? I can't hear you.

Randolph responds, "Yeah, I'm attracted to kids," while the words "I'm attracted" and "kids" appear in the center of the screen in red with the remaining words appear in white.

SECOND OFFICER: You are? Do you watch child p*rn? [3]

RANDOLPH: No.

SECOND OFFICER: You're just attracted to kids? What makes you attracted to them?

---

[3] "P*rn" appears in the captioning, but the related audio portion is replaced with a bleep.

While Randolph answers, "They're beautiful creatures of God," the words "beautiful,"

"creatures," and "God" appear in red in the center of the screen. The video concludes

with the following narration:

> Following his disturbing admission, John was arrested and charged with one count of child enticement. However, according to Idaho law, because the charge is a misdemeanor offense, a suspect can only be placed under arrest if at least one of two conditions are met: Either an officer must witness the alleged crime, or the suspect has a warrant.
> On account of these conditions, an officer contacted the mother of the child along with Benjamin Rodriguez, and the two then placed John under citizen's arrest. The 42-year-old was then booked into the Kootenai County Jail.
> According to police documents, John would go on to make another bogus claim, this time saying that he believed the child to be his son from the future, thus why he wanted to take him parasailing. Yet it would only be another failed attempt at explaining his monstrous actions.
> An update provided by a local news source approximately one week after the incident reported that John pleaded guilty to disturbing the peace. As a result, he served one day in jail and was ordered to pay a $1,000 fine; although it appears that John is still working as an attorney currently.

During this narration, a screenshot of an incident report is shown with the words "CHILD

ENTICING" highlighted in yellow while the words "ACTUAL CASE EXCERPT" appears

in the top right corner of the screen. Other words that appear in large red font in the

center of the screen are: "Disturbing the Peace," "1 day in jail," and "$1000 fine."

After the video was posted to YouTube, it was also shared on Facebook. The

video received millions of views and thousands of likes and comments across the two

platforms. Many of the comments on these videos were negative, calling Randolph a

"creep," a "sicko," and referred to him as a pedophile. The comments also discussed

that Randolph was a lawyer and stated that he should be disbarred and his law license

revoked.

Randolph claimed that for the few months following the August 3 incident he only received local backlash and a few negative reviews for his law office that he was able to get removed because they were not from his clients. However, it was not until EWU Media's video was posted two years later that he received significant backlash. After the video was posted, Randolph received abusive calls to his law office, including a death threat. His law office phone account was placed on "voicemail" status, meaning that all calls would go to voicemail because of the "large influx of abusive callers." Eventually, Randolph closed his law practice and changed his name because of constant harassment.

Randolph sued EWU Media for defamation, injunctive relief, false light, defamation by implication, negligence, negligent infliction of emotional distress, and outrage (intentional infliction of emotional distress). EWU Media filed a special motion for expedited relief under the UPEPA. Randolph opposed the motion contending that the video did not fall under the scope of the UPEPA. Randolph submitted a declaration in response that included a resounding denial of what he asserts EWU Media implied in its video:

> The implication that I am a child predator is false. I am not a child predator. I have never touched a child in an inappropriate place, never sexually touched a child, never said sexual things to a child, never watched child pornography, never lured a child to a non-public place, and never even attempted to do any of these things. Other than the dropped charges for this incident, I have never been charged with or convicted of any of these crimes or any crime relating to children, nor have I been civilly sued for any behavior even remotely close to this.

EWU Media, in its reply, did not take the position that Randolph, in fact, did have a history of child predation. Instead, it argued that Randolph did not have a factual or legal basis to support his claims because "EWU Media's commentary in the video, especially

the ones Plaintiffs alleged in their Complaint, are opinions, not factual statements." After a hearing, the trial court determined that the video falls within free speech and addresses a matter of public concern but found that "there is ample disputed issues of material fact as to – as to Plaintiff's defamation and false light claims." The court denied EWU Media's UPEPA motion.

EWU Media subsequently filed a motion for reconsideration. In response, Randolph alleged that the narration falsely stated that Randolph had a "tumultuous past" because EWU Media had no "dirt" on him or record of past issues. In its reply, EWU Media filed hundreds of pages of additional documents, including records of unrelated civil orders that have nothing to do with child predation. The trial court denied the motion for reconsideration and observed that the additional documents could have been filed with EWU Media's motion to dismiss but instead were filed with its reply brief for the motion for reconsideration, which deprived Randolph of the opportunity to effectively respond to the documents. The trial court considered EWU Media's reply brief but refused to consider the additional filed documents. The court noted that even if it had considered the documents filed in reply, the evidence did not affect the court's determination that the case was not entitled to dismissal under the UPEPA.

EWU Media appeals.[4]

---

[4] EWU Media filed for direct review with the Washington State Supreme Court. Our state Supreme Court considered the case at its April 1, 2025, motion calendar and ordered the case to be transferred to this court.

17

DISCUSSION

UPEPA Motion

EWU Media contends that the trial court erred in denying its UPEPA motion. Washington's UPEPA, chapter 4.105 RCW, is a type of anti-SLAPP (strategic lawsuit against public participation) law designed to provide an expedited process for dismissing lawsuits that target activities protected by the First Amendment, such as freedom of speech, press, assembly, petition, and association on matters of public concern. Thurman v. Cowles Co., 4 Wn.3d 291, 298, 562 P.3d 777 (2025). RCW 4.105.903 provides that "[t]his chapter applies to a civil action filed or cause of action asserted in a civil action on or after July 25, 2021." The UPEPA allows a defendant to file a special motion for expedited relief within 60 days of being served with a pleading asserting a covered cause of action. Id. RCW 4.105.010(3)(a) provides 12 exceptions that fall outside the scope of the act. "The purpose of the UPEPA is to safeguard first amendment rights and to deter and prevent nonmeritorious lawsuits targeted at discouraging individuals from speaking publicly or petitioning the government." Id.

We review statutory interpretation issues de novo. Jha v. Khan, 24 Wn. App. 2d 377, 389, 520 P.3d 470 (2022). "Similarly, we review summary-judgment-like orders de novo, viewing all evidence in favor of the nonmoving party." Id. "In assessing whether the trial court erred by denying [EWU Media's] UPEPA motion, we engage in the three-step analysis dictated by RCW 4.105.060(1)." Id. at 388. First, it is the moving party's burden to establish that the UPEPA applies to the cause of action. RCW 4.105.060(1)(a); Id. at 387. Second, once the moving party has satisfied this requirement, the burden shifts to the responding party to establish that a statutory

18

exception applies under RCW 4.105.060(1)(b). Id. And third, if the responding party fails to demonstrate that an exception applies, the trial court must dismiss the action if either:

> (i) The responding party fails to establish a prima facie case as to each essential element of the cause of action; or
>
> (ii) The moving party establishes that:
>
> (A) The responding party failed to state a cause of action upon which relief can be granted; or
>
> (B) There is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

RCW 4.105.060(1)(c). The court must dismiss the cause of action or part of the cause of action if these three conditions are met. Thurman v. Cowles Co., 29 Wn. App. 2d 230, 239, 541 P.3d 403 (2024), rev'd, on other grounds, 4 Wn.3d 291, 562 P.3d 777 (2025). "In ruling on a motion under RCW 4.105.020, the court shall consider the pleadings, the motion, any reply or response to the motion, and any evidence that could be considered in ruling on a motion for summary judgment under superior court civil rule 56." RCW 4.105.050.

EWU Media argues that the instant video is a matter of public concern because "[b]roadcasts related to crime are a matter of legitimate public concern, sexual or otherwise."[5]

The UPEPA applies when a complaint is based on the individual's "[e]xercise of the right of freedom of speech or of the press, the right to assemble or petition, or the

---

[5] On appeal, Randolph states that he disagrees with the trial court's finding that the video is a matter of public concern related to child sex abuse. However, he admits that he did not cross-appeal this decision because the trial court correctly concluded that questions of fact exist regarding his claims and denied EWU Media's motion to dismiss. He includes in his briefing a subheading that "[p]ublic concern is not on appeal." Because review is de novo, we still address whether the video is of public concern.

right of association, guaranteed by the United States Constitution or Washington state Constitution, on a matter of public concern." RCW 4.105.010(2)(c). Whether speech is a matter of public concern is a question of law, which courts must determine "by the content, form, and context of a given statement, as revealed by the whole record." Billings v. Town of Steilacoom, 2 Wn. App. 2d 1, 31, 408 P.3d 1123 (2017) (quoting Connick v. Myers, 461 U.S. 138, 147-48 n.7, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). Speech involves matters of public concern when it can be fairly considered as related to any matter of political, social, or other concern to the community. Jha, 24 Wn. App. 2d at 389.

Randolph takes issue with the narration and added text on the video "that did not come from police records." We conclude that, considering the content, form and context of the video as revealed by the whole record, the video captures an incident that is a matter of public concern. Police investigating whether a stranger attempting to persuade a child to leave with that stranger is a concern to the community and, therefore, is a matter of public concern.

Under the second step of the UPEPA, we review whether Randolph met his burden to establish that a statutory exception applies. Randolph does not assert that any statutory exception under RCW 4.105.010(3)(a) applies.[6]

Under the third step of the UPEPA analysis, dismissal with prejudice of a cause of action must occur if (1) the responding party, Randolph, fails to establish a prima facie case as to each essential element of the cause of action; or (2) the moving party, EWU Media, establishes that the responding party, Randolph, fails to state a cause of

---

[6] RCW 4.105.010(3)(a) provides 12 exceptions that fall outside the scope of the UPEPA, none of which are relevant in this case.

action upon which relief can be granted; or (3) the moving party, EWU Media, establishes that there is no genuine issue as to any material fact and that party, EWU Media, is entitled to judgment as a matter of law. RCW 4.105.060(1)(c).

Randolph premises all his causes of action on the assertion that EWU Media published false, defamatory statements about him. To establish a prima facie defamation claim, Randolph must show (1) that the defendant's statement was false, (2) that the statement was unprivileged, (3) that the defendant was at fault, and (4) that the statement proximately caused damages. Caruso v. Loc. Union No. 690, 107 Wn.2d 524, 529, 730 P.2d 1299 (1987). "The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." LaMon v. Butler, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989). EWU Media filed its UPEPA motion to dismiss, with the crux of its motion maintaining that none of the information in its narration is directly or implicitly false or is defamation by omission. Accordingly, the burden then shifted to Randolph to prove that he has a prima facie case of falsity as to EWU Media's narration to defeat its UPEPA motion.

Our state Supreme Court does not have a consensus as to whether Washington state recognizes the tort of defamation by implication "caused by certain material omissions." Mohr v. Grant, 153 Wn.2d 812, 828, 108 P.3d 768 (2005) (lead opinion of Fairhurst, J.), 830 (concurring opinion of Alexander, J.) ("I write separately in order to disassociate myself from the majority's apparent recognition of a tort of defamation by implication 'caused by certain material omissions.'"). However, a majority of the court has held that words can defame another directly or by implication. Id. at 830-31

21

(concurring opinion of Alexander, J.). Therefore, a defamation claim can arise from "an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based." Dunlap v. Wayne, 105 Wn.2d 529, 540, 716 P.2d 842 (1986) (citing RESTATEMENT (SECOND) OF TORTS at § 566 cmt. c).

"Washington does not require a defamation defendant to 'prove the literal truth of every claimed defamatory statement.'" Mohr, 153 Wn.2d at 825 (citing Mark v. Seattle Times, 96 Wn.2d 473, 494, 635 P.2d 1081 (1981)). "A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting', is true." Mark, 96 Wn.2d at 494. "The 'sting' of a report is defined as the gist or substance of a report when considered as a whole." Herron v. KING Broad. Co., 112 Wn.2d 762, 769, 776 P.2d 98 (1989). When applying this test, the plaintiff must "show that the false statements caused harm distinct from the harm caused by the true portions of a communication." Mohr, 153 Wn.2d at 825.

All alleged defamatory statements must be statements of fact, not opinion. Davis v. Fred's Appliance, Inc., 171 Wn. App. 348, 365, 287 P.3d 51 (2012). Whether a statement is a fact or an opinion is a question of law that is properly and preferably decided on summary judgment. Benjamin v. Cowles Publ'g Co., 37 Wn. App. 916, 922, 684 P.3d 739 (1984). The line between fact and opinion "is sometimes blurry," therefore, we consider three factors to determine whether a statement is actionable: "'(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts.'" Davis, 171 Wn. App. at 365 (quoting Dunlap, 105 Wn.2d at 539). "The court should

consider the entire communication and note whether the speaker qualified the defamatory statement with cautionary 'terms of apparency'" such as "seems." Life Designs Ranch, Inc. v. Sommer, 191 Wn. App. 320, 331, 364 P3d 129 (2015) (quoting Info. Control Corp. v. Genesis One Comput. Corp., 611 F.2d 781, 784 (9th Cir. 1980)).

Under the first factor, the more the author provides background information to the report, particularly the author's subjective experience, the less likely the court will permit liability. Carter v. Jones, 36 Wn. App. 2d 118, 186, 581 P.3d 1050 (2025) (citing Gross v. N.Y. Times Co., 82 N.Y.2d 146, 153-54 (1993)). This is because when more background information is provided, the viewer can decide for themselves how to interpret the information presented. Id. (citing Gross, 82 N.Y.2d at 153-54).

The second factor focuses on the audience of the communication, and audience expectations are of paramount importance. Dunlap, 105 Wn.2d at 539. For example, when the material presented is an ongoing public debate, the audience is more likely to anticipate mischaracterizations and exaggerations, wary of speakers' subjective biases. Id. Accordingly, we consider whether the audience expected the speaker to use exaggeration, rhetoric, or hyperbole. Id.

Finally, under the third, most crucial factor, we must consider whether the statement of opinion implies that undisclosed facts support it. Id. A statement of "pure" opinion is not actionable. Id. at 538. However, if a statement is in the form of an opinion, it can be actionable if it implies defamatory facts as the basis for that opinion. Carter, 36 Wn. App. 2d at 187 (citing RESTATEMENT (SECOND) OF TORTS § 566). Therefore, a statement may be provably false if it "falsely describes the act, condition or event that comprises its subject matter." Schmalenberg v. Tacoma News, Inc., 87 Wn. App. 579,

591, 943 P.2d 350 (1997). "If a direct statement of facts would be defamatory, then a statement of an opinion implying the existence of those false facts supports a defamation action." Valdez-Zontek v. Eastmont Sch. Dist., 154 Wn. App. 147, 158, 225 P.3d 339 (2010).

In EWU Media's narration, it describes Randolph as a "deranged suspect" who is "hiding a most disgusting secret" and states that the police investigation of him is "sickening" and his actions and the investigation are "disturbing" after Randolph "creepily" talked to children. The narrator informs viewers that "we'll learn that John does, in fact, have a bit of dirt on him, so to speak." The narrator later adds, "Apparently, John is allegedly hiding a rather tumultuous past. A woman who would like to remain anonymous asserts that the suspect is a ticking time bomb. You don't know when he's going to relapse. Just wait until he unveils his most sick and twisted confession." EWU Media inserted this narration immediately before playing the portion of the video where officers ask Randolph if he is attracted to children and he first says no but then, when pressed by the officer, agrees that he is attracted to children and that children are "beautiful creatures of God." Moreover, the video captioned and emphasized the words "ticking time bomb" and "relapse" in red and all capital letters in the center of the screen.

Evaluating the entire context of the video in the light most favorable to Randolph, a reasonable jury could find that EWU Media's narration presented Randolph as having a history of child predation. First, while EWU Media's inclusion of the bodycam footage and security footage could be viewed as background context that allows the viewer to interpret the situation for themselves, the narration implies that he has engaged in

24

similar acts in the past. The narration added information to the video. Specifically, EWU Media informed viewers that Randolph "does, in fact, have a bit of dirt on him, so to speak," "apparently" has a "tumultuous past," and that, according to an anonymous source, is a "ticking time bomb," at risk of "relapse." During the narration, EWU Media emphasizes the words "TICKING TIME BOMB" and "RELAPSE," in large red font in the center of the screen. Even if it could be argued that these statements were opinions, they are opinions that imply the existence of false facts. In context, those implied facts are that Randolph has a history of child predation. The narration prompts the viewer with, "Just wait until he unveils his most sick and twisted confession" before showing the portion of the video where Randolph, in answering police, says that he is attracted to children. Significantly, police incident reports, which were included in the public record and available to EWU Media, explained that officers stopped asking Randolph questions because he was answering "yes" to everything and they felt that "something was not right" and he was not being truthful. This background was not included within EWU Media's video, posted for millions of viewers.

Additionally, EWU Media's video, posted about two years after the August 3, 2021, incident, was not a contribution to an ongoing public debate where the viewer would expect mischaracterizations and exaggerations. See Dunlap, 105 Wn.2d at 539. Although the video included a disclaimer that said that the video was for "entertainment purposes only" and "is not to be relied upon as legal advice or opinion on any matter" this disclaimer merely flashed on the screen and was a paragraph long, so the viewer would have to pause the video to read it. More importantly, EWU Media did not present this posting as fiction "entertainment." It presented information based on a real-life

incident that involved police, an arrest, and a conviction.

Though EWU Media's video does not explicitly state that Randolph has a history of child predation, a statement of an opinion implying the existence of such false facts supports a defamation action. Valdez-Zontek, 154 Wn. App. at 158. Randolph submitted a declaration that denied any history of child predation. The burden then shifted to EWU Media to prove that its narration was true. EWU Media did not take the position that the narration was true. Instead, it argued that the narration includes opinions, not factual statements.[7] Because a reasonable jury could find that the "gist" of EWU Media's narration over the video implied that Randolph has a history of child predation, genuine questions of material fact remain as to whether false statements caused harm distinct from the harm caused by the true portions of EWU Media's video. We affirm the trial court's denial of EWU Media's motion to dismiss under the UPEPA.

## Fair Reporting Privilege

As an alternative basis to dismiss Randolph's claims, EWU Media maintains that the fair reporting privilege applies to its video.[8]

Regardless of whether a statement is true or false, certain privileges can shield a speaker from liability for defamation and false light. Alpine Indus. Computs., Inc. v. Cowles Pub'g Co., 114 Wn. App. 371, 381, 57 P.3d 1178 (2002). "The purpose of the fair reporting privilege is to serve the public's interest in obtaining information as to what transpires in official proceedings and public meetings." Id. at 384. "The privilege is not

---

[7] Given the crux of the falsity claims by Randolph and EWU Media's response, we need not further discuss Randolph's other related claims.

[8] Below, EWU Media raised the fair reporting privilege for the first time in its reply brief. Randolph did not move to strike, and the trial court considered the reply brief. On appeal, Randolph does not argue that this argument is waived and instead responds to the argument.

intended as merely a convenient method of shielding the press from tort liability, but instead is intended to ensure that information is made available to the public concerning what occurs in official proceedings." Alpine Indus., 114 Wn. App. at 384 (citing Pittman v. Gannett River States Publ'g Corp., 836 F. Supp. 377, 382 (S.D. Miss. 1993)). Under the fair reporting privilege, a defendant's statements are privileged when the defendant is "reporting on defamatory statements contained in official proceedings and records." Clapp v. Olympic View Publ'g Co., 137 Wn. App 470, 475-76, 154 P.3d 230 (2007) (citing Alpine Indus., 114 Wn. App. at 382).

The burden is usually on the plaintiff to prove abuse of a conditional privilege in most defamation and false light cases. Haueter v. Cowles Publ'g Co., 61 Wn. App. 572, 587, 811 P.2d 231 (1991) (citing Bender v. City of Seattle, 99 Wn.2d 582, 601, 664 P.2d 492 (1983)). "However, the fair reporting privilege is incapable of being abused; either the privilege applies or it does not." Jha, 24 Wn. App. 2d at 400 (citing Alpine Indus., 114 Wn. App. at 385). Therefore, we determine whether the fair reporting privilege applies as a matter of law. Alpine Indus., 114 Wn. App. at 386. If the fair reporting privilege applies, the claim must be dismissed on a UPEPA motion. Jha, 24 Wn. App. 2d at 400.

"The fair reporting privilege applies where the communication is attributed properly to an official proceeding and the report is an accurate report of that proceeding or a fair abridgement." Alpine Indus., 114 Wn. App. at 384. "For a report to be a fair abridgment of an official proceeding, surgical precision is not required so long as the report is substantially accurate and fair." McNamara v. Koehler, 5 Wn. App. 2d 708, 716, 429 P.3d 6 (2018) (citing Alpine Indus., 114 Wn. App. at 386).

27

Randolph does not challenge EWU Media's right to post the body cam footage or security footage from the August 3 incident. Nor does he challenge EWU Media's right to accurately report on how his matter was resolved by way of his guilty plea to disturbing the peace and the sentence he received. Instead, he challenges the voice-over narration that added information beyond what was depicted in the video or available through court records. The narrator informed viewers that Randolph "does, in fact, have a bit of dirt on him, so to speak," that "[a]pparently, [Randolph] is hiding a rather tumultuous past," and that he is a "ticking time bomb" such that "[y]ou don't know when he's going to relapse."

The only apparent "source" of this added information is not from official proceedings and records, but, instead, from "[a] woman who would like to remain anonymous." By its own description of the "source" of this added information, we conclude that the fair reporting privilege does not apply to the challenged portion of the narrative that added information beyond what was recorded in the video. As discussed above, viewed in context, a reasonable jury could find that the "gist" of EWU Media's voice-over narration was that Randolph has a history of child predation. EWU Media's reporting on the facts of the August 3 incident is not the same as presenting information that could be viewed as painting Randolph as someone with a history of child predation. EWU Media does not establish that it merely obtained and reported this information in the narration from official proceedings. We conclude that the fair reporting privilege does not apply to EWU Media's narration and is not a basis to dismiss Randolph's claims.

Reconsideration

In its assignments of error, EWU Media identifies two errors related to the motion

for reconsideration:

> 2. The trial court erred in denying EWU[ Media]'s Motion for
> reconsideration.

> 3. The trial court erred in refusing to consider materials filed with the
> motion for reconsideration or Reply on motion for reconsideration when
> Plaintiff had denied such records existed in its Response to the Motion for
> Reconsideration.

However, EWU Media did not dedicate a section of its brief to address the denial of the

motion for reconsideration. At most, its brief mentions the trial court's refusal to consider

documents it submitted with its reply on the motion for reconsideration, and it references

this issue at the end of a section identified as addressing Randolph's list of disliked

words. Moreover, the single paragraph referencing reconsideration does not provide

any citations to the record or supporting authority. RAP 10.3(a)(6) (requiring an

appellant's brief to provide "argument in support of the issues presented for review,

together with citations to legal authority and references to relevant parts of the record");

see also Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 845, 347 P.3d 487

(2015). "An assignment of error not argued in a party's brief is abandoned." Herdson v.

Fortin, 26 Wn. App. 2d 628, 637 n.3, 530 P.3d 220 (2023). We conclude that EWU

Media abandoned its assignments of error relating to the motion for reconsideration.[9]

Attorneys' Fees

EWU Media and Randolph request fees on appeal under RAP 18.1(a) and RCW

4.105.090. RAP 18.1(a) states that "[i]f applicable law grants to a party the right to

---

[9] We need not address Randolph's argument that the documents submitted with EWU Media's motion for reconsideration reply brief are inadmissible hearsay.

recover reasonable attorney fees or expenses on review before … the Court of Appeals … the party must request the fees or expenses as provided in this rule, unless a statute specifies that the request is to be directed to the trial court." RCW 4.105.090 provides that under a UPEPA motion, the court must award "costs, reasonable attorneys' fees, and reasonable litigation expenses related to the motion" to the moving party if they prevail on the motion or the responding party if they prevail on the motion "and the court finds that the motion was not substantially justified or filed solely with intent to delay the proceeding."

Because EWU Media is not the prevailing party, it is not entitled to fees. The trial court also denied Randolph's request for attorneys' fees, and we do the same on appeal. UPEPA permits an award of attorneys' fees to the responding party "if the responding party prevails on the motion and the court finds that the motion was not substantially justified or filed solely with intent to delay the proceeding." RCW 4.105.090(2). While Randolph prevails on appeal, he has not established that EWU Media's UPEPA motion to dismiss was not substantially justified or intended to delay.[10]

CONCLUSION

We affirm.

_Coburn, J._

WE CONCUR:

_Feldman, J._

_Birk, J._

---

[10] Because we affirm the trial court, we need not consider or address EWU Media's request for fees and costs under RCW 4.84.185 and CR 11 sanctions on appeal.